621 So.2d 1118 (1993)
Wilmer CHAMBERLAIN and Beverly Leblanc Chamberlain, individually and on behalf of their minor son, Chad Anthony Chamberlain
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, and ABC Lighting & Electrical Contractors, Inc.
No. CA91 1942.
Court of Appeal of Louisiana, First Circuit.
January 20, 1993.
*1119 William A. Porteous, III, New Orleans, for plaintiffs and appelleesWilmer Chamberlain et al.
Stephen P. Callahan, Houma, for defendant and appellantDept. of Transp. & Development.
Estelle E. Mahoney, Houma, for intervenor, Louis J. St. Martin.
Before LOTTINGER, C.J., and FOIL and FOGG, JJ.
FOIL, Judge.
In this appeal, we are asked to review the trial court's rulings on liability and quantum. Also presented for review is the constitutionality of the statutory limitation on general damages in a personal injury suit against the State. The trial court entered judgment against the State, limiting the amount of general damages to $500,000.00. We affirm.

FACTS
On June 13, 1987, plaintiff, seventeen-year-old Chad Chamberlain, nearly drowned in Bayou Black, located in Houma, Louisiana, and suffered severe brain damage as a result. That afternoon, Chad and several of his friends, Mark Arceneaux, Pete Dessell, and Tony Bergeron (all teenagers), arrived at a bridge which crosses the bayou to go for a swim. Chad, Mark and Pete climbed the bridge and dove off into the center of the bayou, while Tony stayed behind on the bank. The bridge is located near Jim Bowie Park, a recreational area, and is also approximately 100 feet from a fire station. There is a no diving and a no swimming sign on the bridge.
After diving in, Chad, Mark and Pete swam to a nearby bulkhead, or "fender system" constructed underneath the bridge. There were three navigation lanterns located on top of the bulkhead, which were to guide ships travelling underneath the bridge. The fender system is made up of creosote wooden piles with a wood timber walkway on top and wooden timbers underneath. Gangplanks provide access to the bridge fender from the side of the bayou. The bulkhead was about 8 inches above water on the date in question.
The boys climbed on top of the bulkhead and engaged in a game of "King of the Mountain." Tony threw Mark off first, in the center of the bayou about 5-6 feet from the bulkhead. Tony then threw Chad off of the bulkhead in the other direction, towards the bank. The evidence established that Chad was thrown approximately 2-4 *1120 feet from the navigation light located on the southwest end of the fender system.
Mark, who surfaced first, swam to the bulkhead, climbed back on and soon noticed a wallet floating on the water in the vicinity of the southwest navigation lantern. He realized that Chad had not resurfaced and began screaming this to Pete, who had left the area to dive off the bridge again. Pete signaled to Tony to get help. When Pete arrived back at the bulkhead, he and Mark jumped into the water toward the center of the bayou to search for Chad. Pete, who was about a foot ahead of Mark, testified that he started feeling along the ledge of the bulkhead. As he approached the edge of the bulkhead, going in the direction of the light, he felt a tingle of electricity. Pete told Mark that he felt electricity in the water and that it was shocking him. Pete continued moving towards the light; he stated that the closer he got, the stronger the electrical current felt. He testified that when he was about four feet from the light, the electrical current was so strong that it was like a "force field" and he was unable to push himself any further into the area where Chad entered the water.
In the meantime, two firemen, Danny Hebert and Camille Duplantis, on duty at the nearby fire station, were alerted that something happened at the bridge and arrived at the scene to assist. Both firemen testified that one of the boys told them that there was electricity in the water that was shocking him and that the closer he got to the bulkhead, the stronger the electrical current was. The boys were ordered to get out of the water. The firemen were told by one of the boys that Chad was thrown in the water close to the light; one of the boys threw a bottle to mark the location where Chad entered. Camille Duplantis ran to the power source for the bridge and pulled the meter, thereby cutting off all electrical power to the fender system. After being informed that the power was off, Danny Hebert tested the water to see if it was charged, but felt nothing. Mr. Hebert, Officer Kelly Massa, Mark and Pete jumped into the water in search of Chad.
Chad's body was found by Mr. Hebert underneath the bulkhead, right next to the southwest navigation light where Chad had entered the water. Officer Massa, who went underwater to retrieve Chad's body, found him lying directly below the light, under the pilings. The evidence showed that Chad was underwater for 15-20 minutes; he was resuscitated by paramedics at the scene. As a result of this accident, Chad suffered severe brain damage and is in a vegetative state, both physically and mentally.
The evidence also revealed that at the time of the incident, Chad was 17 years old, about 5'10" to 6' tall, athletically inclined and a very good swimmer. The water was approximately 4-6 feet deep at the point where Chad fell in. When Chad was pulled from the water, there were no bruises, brush-burns, hickies, hematomas, scratches or any other sign of physical injury on Chad's body.
The evidence also showed that only two nights before the accident, during his evening shift, Camille Duplantis observed that the light on the southeast end of the fender system was illuminated. Danny Hebert also attested that he routinely saw the lantern on the southeast portion of the fender system, the side closest to the firehouse, functioning. He noted that the southwest portion of the fender is not visible from the fire station.
Wilmer and Beverly Chamberlain, individually and on behalf of their son, Chad Chamberlain, filed this suit seeking damages against the State of Louisiana, Department of Transportation and Development (DOTD), claiming that the electrical system on the fender, under DOTD's control, was defective, causing electrical current to leak into the water. They asserted that Chad's encounter with this electrical current caused him to experience an electrical shock which caused him to nearly drown and which was responsible for his injuries resulting therefrom. DOTD, on the other hand, theorized that Chad Chamberlain did not encounter electricity when he fell in the water and even if there was electrical current in the water, it was not of *1121 a sufficient magnitude to cause him any harm. Instead, DOTD urged that Chad's near drowning occurred because he became trapped or entangled in the fender system on his own accord.
The issues of liability and damages were bifurcated for trial before a judge. The trial court ruled that plaintiffs proved that Chad's injuries resulted when he encountered electrical current present in the water due to defects in the fender system and that the requisite knowledge element had been established. The trial court awarded Chad Chamberlain $3,453,781.42 in special damages for past and future medical care and loss of earning capacity. With respect to general damages, DOTD asserted the $500,000.00 limit on the State's liability under La.R.S. 13:5106 B(1). The trial court rejected plaintiffs' claim that the cap was unconstitutional, and held that Chad Chamberlain's general damage claims, along with his mother and father's loss of consortium claims, constituted "one claim" subject to the $500,000.00 cap.
This appeal, taken by DOTD and the Chamberlains, followed. DOTD contends that the judgment is null and void because the matter was set for trial before it answered. It also contests liability and the awards for various elements of general and special damages as excessive. Plaintiffs challenge the constitutionality of the $500,000.00 limitation on the State's liability for general damages. Alternatively, they assert that the trial court erred in considering their individual loss of consortium claims and Chad's general damage claims as "one claim" instead of three separate claims for the purpose of the $500,000.00 cap. Additionally, Chad's parents insist that the trial court erred in failing to enter an award for mental anguish in their favor.

NULLITY OF THE JUDGMENT
DOTD argues that the judgment entered into is null and void and should be remanded back to the trial court because the matter was set for trial before DOTD answered the petition, in contravention of La.Code Civ.P. art. 1571. That provision, which sets forth that district courts shall prescribe the procedure for assigning cases for trial, states in part that "[t]hese rules shall not allow the assignment of ordinary proceedings for trial except after answer filed."
The record discloses that DOTD took writs to this court asserting this identical argument, in the context of a motion for a continuance. DOTD filed a motion in the trial court to upset the trial date on the basis that the court set the matter for trial prior to DOTD's having filed an answer. DOTD did not file an answer because its vagueness exception was still pending when the case was set for trial. However, on November 16, 1988, plaintiffs filed a supplemental petition which DOTD readily admits cured its vagueness exception. DOTD still did not answer the petition, insisting that it was entitled to a continuance because the case was set for trial before it answered and holding a trial would only result in a voidable judgment.
The trial court denied DOTD's motion for a continuance and DOTD took writs on this issue to this court, contending it was entitled to a continuance under article 1571. This court fully considered the argument on the effect of the setting of the trial before DOTD answered under article 1571, ruling that if the trial were held before DOTD answered, then any judgment resulting therefrom would be subject to being voided on appeal. However, the fact DOTD did not answer when the case was given a trial date did not require that a new trial date be set. This court ordered DOTD to answer the plaintiffs' supplemental petition, which it did on December 2, 1988. Trial began on December 5, 1988. DOTD did not take writs to the Supreme Court.
In this appeal, DOTD contends that the judgment is null and should be voided by this court because the matter was set for trial before it answered. DOTD insists that this court erred in ruling on its writ application by failing to fully consider the article 1571 argument, misstating the law, and miscalculating the time DOTD had to answer the supplemental petition.
*1122 Insofar as this court is concerned, our prior ruling on the impact of article 1571 on this proceeding is the law of this case. The "law of the case" principle embodies the rule that an appellate court ordinarily will not reconsider its own rulings of law in the same case. Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1st Cir.), writs denied, 605 So.2d 1099, 1100 (La. 1992). The doctrine is a discretionary guide and is not applicable in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur. Id. at 705. We find no error in this court's earlier ruling. In ruling on the writ application, this court fully considered DOTD's argument on the legal effect of the setting of the trial prior to answer. DOTD answered before the trial was held; therefore, article 1571 does not require that this court vacate the judgment.

LIABILITY
DOTD principally attacks the trial court's finding that there was electricity in the water by challenging its factual finding that there was a light bulb in the southwest navigation lantern on the fender system.
Plaintiffs' expert, Dr. Robert Alonzo, testified that there was electricity in the water at the southwest navigation lantern, which was located on the fender 2-4 feet from the point where Chad fell in. Dr. Alonzo testified that the source of this electrical current was an exposed wire, located right next to the navigation lantern, which was stringing down into the water at the time of the accident.
Dr. Alonzo identified several faults in the electrical system which ultimately accounted for the presence of electricity in the water. First, he noted that the fender system, which contains three lanterns (one at the southeast end, the southwest end and the center), was originally wired as a parallel circuit. In a parallel circuit, each of the three navigation lights on the fender system was in a separate circuit; thus, if one light was not operational, the remaining lights could still operate. Dr. Alonzo noted that the center navigation lantern had been terminated some time prior to the accident and it therefore was no longer in the series. According to Dr. Alonzo, an electrical fault developed in the junction box when one of the neutral terminals responsible for carrying electrical current broke loose and the terminal, over the course of time, melted. This fault caused the parallel circuit to convert to a series circuit. A good example of a series circuit is a Christmas tree light string: if one of the bulbs in the series does not operate, none of the other bulbs in that series do either. The evidence showed that the lantern on the southeast end of the fender was observed illuminated shortly before the accident. If Dr. Alonzo's theory were correct, the light fixture on the southwest end, where Chad fell in, would also be operating, since the southeast fixture could not function if the southwest fixture was not working. Necessarily, for there to be electricity in the water at the site of the accident, as Dr. Alonzo attested it was, there would have to be a working light bulb in the southwest navigation lantern, since the electrical current would not have travelled to the site of the injury if there was no light bulb in that fixture.
In disputing the trial court's factual finding that there was a light bulb in the southwest lantern on the date of the accident, DOTD argues that the trial court should have suppressed certain evidence offered by the plaintiffs relating to the existence of a light bulb in that socket. The record shows that when Mr. Alonzo and DOTD's expert conducted a site investigation on July 1, 1987, two weeks after the accident, there was no light bulb in the socket on the southwest navigation lantern. At trial and for the first time, it was revealed through the testimony of Mr. Alonzo that there had been a light bulb in that fixture prior to the inspection. While discussing his theory, Mr. Alonzo testified that although he observed that the light bulb was missing in the southwest lantern during inspection, he already was aware that the bulb had been removed from the fixture by plaintiff's initial attorney, who did not try this case. He attested that he was present at that office when the attorney *1123 produced a 69 watt, 130 volt traffic signal lamp. The attorney revealed that he removed the bulb from the navigation lantern at the accident site after the accident. DOTD's attorney demanded that the court issue a subpoena for the attorney to produce the light bulb. That attorney never did testify regarding the light bulb.
At a later point in Mr. Alonzo's testimony, while he explained that he attempted to simulate the presence of a light bulb in the lantern during an experiment, DOTD objected and requested a continuance, complaining that the evidence was allegedly removed from the scene without its knowledge and that it was never informed, until the trial, of the existence of the light bulb in the lantern in question. DOTD argued this evidence was highly prejudicial. The trial court denied the motion, noting that by its own admission, DOTD's defense has always been that there was no light bulb in the southwest lantern and, consequently, there was no electricity in the water where Chad fell in. The trial court stated that at most, this evidence altered the State's cross-examination to some extent.
The trial progressed, and Mr. Wilmer Chamberlain testified that on the day he hired the initial attorney, he, the attorney and an electrician went out to the accident scene and he observed that the lights on the fender system were on. He stated that he saw the attorney take the light bulb out of the socket and put it into his pocket. Later that day, an injunction was issued prohibiting the removal of evidence from the scene. At this point, DOTD's attorney objected to the "whole deal about the light bulb." Thereafter, Mr. Leonard Pizzolato, an electrician, testified that he was present at the scene with the attorney in June of 1987; that the attorney removed a light bulb and handed it to him. The electrician stated that he stamped the bulb with his initials. At trial, he testified that the filaments in the bulb were still intact; that is, it would work if screwed into a socket. Plaintiffs' attempt to introduce the light bulb into evidence was met with an objection by DOTD, who requested that any evidence pertaining to the light bulb be stricken from the record because of its prejudicial nature and the fact that plaintiffs' attorney had the bulb and never made it available to DOTD. The trial court overruled the objection, allowing the light bulb to be admitted into evidence. The court noted that the existence of a light bulb could have been determined through discovery, and that it would be quite a different matter if it were brought to the court's attention that there had been negative responses by the plaintiffs when questioned about the existence of a light bulb.
DOTD argues that the trial court erred in failing to suppress this evidence relating to the light bulb, which was "illegally" taken from the scene and "intentionally suppressed," on the basis of prejudicial surprise. DOTD points out that after allegedly removing evidence from the scene, the attorney obtained an injunction preventing DOTD from removing evidence at the scene. Despite having the light bulb in its possession, plaintiffs never notified DOTD of this evidence and did not list it on their exhibit list.
We agree that the trial court should not have allowed the witnesses to testify regarding the removal of the light bulb from the scene, nor should it have allowed the light bulb to be introduced into evidence. Despite substantial discovery, plaintiffs never did reveal the existence of the light bulb to DOTD until the day of the trial. We believe that sufficient notice of this evidence was not given to DOTD prior to trial and it should have been excluded. See Philip Werlein, LTD v. Daniels, 538 So.2d 722 (La.App. 4th Cir.), writ denied, 543 So.2d 21 (La.1989). However, after examining all of the evidence relating to the presence of electricity at the accident site, we conclude that this evidence did not have a prejudicial effect on DOTD's case and the trial court's error in admitting it was harmless.
DOTD offered expert evidence in support of its theory that there was no electricity at the accident site. Dr. Alton Patton testified that he inspected the southwest navigation lantern two weeks after the accident and found it to be in very poor condition. *1124 He attested that the socket was bent; that it could not have gotten bent if there was a light bulb in it; and that no one could have removed a light bulb from that socket. Further, he observed that the contact at the bottom of the lamp socket was loose, so that even if there was a bulb in that fixture, it would not have been operational because there was not proper contact. Dr. Patton did find a light bulb in the southeast navigation lantern. He admitted that he did not take any notes of his initial inspection. DOTD also attacks the credibility of the boys who reported feeling electricity in the water, particularly with respect to Mark Arceneaux. Mark testified at trial that he did feel electricity in the water; however, in an earlier deposition, he stated that he did not feel anything in the water that afternoon.
The trial court found as a fact that the water was energized by an electricity leak into the canal at the site of the accident. In so finding, the court relied on Dr. Alonzo's theory that none of the fender lights would have worked if one was not operational and that a witness attested that at least one of the lanterns on the fender system was illuminated two evenings prior to the accident. The court also stressed that it was very impressed by the testimony of the boys and firemen as to what occurred after Chad was discovered missing. Pete Desselle testified that he encountered a "force field" that prevented him from going any further towards the location where he knew Chad had entered the water. The first thing the firemen were told when they arrived at the scene was that there was electricity in the water and that electrical current was stronger nearer to the light, where Chad fell in. The court stated it would be quite difficult to believe that Pete Desselle concocted this story when he knew his friend was missing beneath the surface.
The question of whether there was a light bulb in the southwest navigation lantern involved a credibility determination. If one believed the testimony of Dr. Patton, there could be no light bulb in that fixture and consequently there could be no electricity at the site. However, if one believed the testimony of Pete Desselle that he felt electricity in the water, there simply had to be a light bulb in that socket, as there was no other source by which electricity could have entered the water at that site. Where factual findings are based on determinations regarding the credibility of witnesses, the manifest error standard of review demands great deference to the trier of fact's findings. It is only where documents or objective evidence so contradict the witness's story, or the story is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story that manifest error may be found on appeal. Where such factors are not present, and the fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). After thoroughly reviewing the entire record, we find no manifest error in the trial court's conclusion that there was a light bulb in the southwest navigation lantern.
DOTD next argues that the trial judge erred in ruling that the presence of electricity in the water caused Chad's injuries. The explanations of what happened to Chad that afternoon, offered through expert testimony by both parties, were conflicting. Dr. Keith Van Meter, who specialized in treating divers, reviewed all of the information surrounding the accident. He opined that Chad encountered sufficient electrical current at the point of entry to cause him to become disoriented or "lose his bearings," which prevented him from responding as an able-bodied swimmer entering four feet of water should have. He noted that in the absence of electrical shock or other underwater injury, the normal reaction to a drowning situation would be to clutch and fight for the surface with some vigor before succumbing. However, no one at the site saw any indication of a struggle going on. The expert stressed that Chad was young and a good swimmer. Further, at Chad's height, given that he fell into only four feet of water, all he would have to do was stand up to increase *1125 his chances of survival if he got into trouble below the surface. Dr. Van Meter also focused on the absence of any physical evidence of injury on Chad's body, as supportive of his conclusion. He opined that had Chad indeed been trapped in the fender system, as DOTD's expert suggested, there should have been some evidence of cuts and bruises on his body, and one would expect to find creosote materials on him.
DOTD's expert, Dr. Glen Egstrom, who did an underwater accident reconstruction, surmised that Chad became trapped in the fender system or entangled in lines located thereon as he attempted to swim back to the bulkhead. Dr. Egstrom dove underwater and surveyed the fender system, finding that the boards created a "box like" structure, with a maximum width of 28 inches. He believed that Chad landed feet first in the water and then turned to swim to the fender, located about four feet away. At this point, Chad would have to be in control to turn and swim in the other direction. The expert believed that, either as he swam underwater or as the result of slipping on a slope very near the lantern, he got trapped on both sides of the fender or became entangled in the fishing lines. He stated that since the space in which Chad was trapped was so confining, he would not expect one at the surface to see any evidence of thrashing. Further, he stressed the lack of physical evidence that Chad encountered electrical current at the site. However, Dr. Van Meter attested that it was not unusual for there to be no medical signposts of an electrical injury, especially where the body has been immersed in the water. Dr. Egstrom did admit that under all of the facts, it was reasonable to conclude that coming into contact with electrical current could account for Chad's injury.
Additionally, there was a great divergence among the experts as to how much electrical current was in the water at the point where Chad entered. None of the experts could identify the exact amount of electrical current in the water with any certainty. The only thing all experts agreed on was that if the wire stringing down into the water, which was located right next to the lantern, was the source for the electrical current, then Chad encountered a dangerous amount of electricity when he fell into the vicinity of that electrical source. Plaintiffs' evidence established that wire to be the source of the leaking electrical current. After reviewing the entire record, we conclude that the trial court's determination that the electricity encountered by Chad at the site caused his injuries was a reasonable one, and we therefore decline to disturb it. Rosell v. ESCO, 549 So.2d at 849.

QUANTUM
We next address the parties' challenges to the awards entered by the trial court. At the outset, we must address plaintiffs' challenge to the constitutionality of the limitation on the State's liability for general damages found in La.R.S. 13:5106.
La.R.S. 13:5106 B(1) provides that "[i]n any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars." The purpose for the limitation of liability is set forth by the legislature in subsection E of the statute. The statute provides:
E. The legislature finds and states:
(1) That judgments against public entities have exceeded ability to pay on current basis.
(2) That the public fisc is threatened by these judgments to the extent that the general health, safety, and welfare of the citizenry may be threatened.
(3) That the limitations set forth in this Section are needed to curb the trend of governmental liability abuses, to balance an individual's claim against the needs of the public interests and the common good of the whole society, and to avoid overburdening Louisiana's economy and its taxpaying citizens with even more new and/or increased taxes than are already needed for essential programs.
(4) That the purpose of this Section is not to reestablish any immunity based on *1126 the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the constitution.
Plaintiff argues that the cap is unconstitutional under several constitutional provisions. First, plaintiffs insist that the provision violates the proscription against sovereign immunity, La. Const. Article XII, Sec. 10(A), which provides: "Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property." Plaintiffs insist that the cap is violative of this provision because it reduces the liability of the State and partially immunizes the State from liability.
In Sibley v. Board of Supervisors of Louisiana State University, 462 So.2d 149 (La.1985) (Sibley 1), the Supreme Court was presented with a similar argument in the context of a cap on damages in a medical malpractice action, which it concluded on original hearing was applicable to the State. On rehearing, the Louisiana Supreme Court reversed its ruling and held that the damage limitation applied to the State only when its liability was vicarious. Sibley v. Board of Supervisors of Louisiana state University, 477 So.2d 1094 (La. 1985) (Sibley II). Sibley II did not address Sibley I's holding on the sovereign immunity argument set forth in that case.
In Sibley I, as in the present case, the plaintiffs argued that because the cap provision reduced the value of the award against the State for damages, it unconstitutionally relieved the State of a part of its liability in violation of Article XII, Section 10(A). The Supreme Court noted that the primary purpose for the waiver of sovereign immunity was to eliminate the unnecessary, burdensome and costly first step of getting legislative approval in order to bring suit against the state or its subdivisions. The Court found nothing in the waiver of immunity provision which would prohibit the legislature from limiting in any respect recoverable tort damages against the State. We agree that limiting recoverable damages against the State does not offend Article XII, Section 10(A) of the constitution.
Plaintiffs also contend that the statute, as applied to the plaintiffs, violates the equal protection clauses of the Louisiana and federal constitutions because it impermissibly discriminates against the handicapped. However, in Butler v. Flint Goodrich Hospital of Dillard University, 607 So.2d 517 (La.1992), the Louisiana Supreme Court rejected a similar argument in the context of the $500,000.00 cap on general damages in a medical malpractice action against multiple defendants. La.R.S. 40:1299.42(B)(1). The Supreme Court set forth that the test for analyzing the constitutionality of a cap limitation provision, in the context of an equal protection claim, is whether that provision is reasonably related to furthering general social interests. The Court noted that the cap was a legislative response to the malpractice insurance crisis. Although one group of malpractice victims would only receive full compensation for their medical expenses and related benefits, those most severely injured by medical malpractice were given the benefit of a greater likelihood that the offending health care provider would have malpractice insurance, greater assurance of collection from a solvent fund and payment of all medical care and related benefits. This "quid pro quo" was a reasonable alternative remedy and constituted a reasonable but imperfect balance between the rights of victims and those of health care providers. The Court concluded that because the statutory solution to the medical malpractice problem furthered the legitimate state purposes of compensating victims and providing full medical care to injured victims, it was not unconstitutional under either the state or federal constitutions.
The legislature succinctly set forth the reasons for enacting the cap in suits against the State in the statute itself: (1) that judgments against public entities have exceeded the ability to pay on current basis; (2) that the public fisc is threatened by these judgments to the extent that the general health, safety and welfare of the citizens *1127 may be affected and (3) to avoid overburdening Louisiana's economy and its taxpaying citizens with even more new and/or increased taxes. La.R.S. 13:5106 E(1) (2) and (3). Like the statute in Butler, the cap at issue is designed to insure that the state will be able to compensate victims and it provides for payment of all care and related benefits. Compensation and full medical care for victims are legitimate social interests, which are furthered by the legislation. Additionally, the legislation furthers the legitimate interest of the State in protecting its citizens from the overwhelming costs of lawsuits which threaten the ability of the state to carry out its fiscal responsibilities. The cap is reasonably related to the legitimate state interests in providing compensation for tort victims and protecting the public welfare. Consequently, we find no violation on equal protection grounds.
Next, plaintiffs insist that the statute violates Article I, Section 22 of the Louisiana Constitution, which provides that "[a]ll courts shall be open and every person shall have an adequate remedy by due process of law and justice ... for injury to him or his person, property, reputation or other rights." Plaintiff argues that by limiting the amount of general damages recoverable, the cap deprives tort victims of an adequate remedy. Since the statute in question does not affect fundamental rights, the legislation need only be reasonably related to the furthering of general social interests. Butler, 607 So.2d at 519; See also Sibley I, 462 So.2d at 157 (stating that the right of malpractice victims to sue for damages caused by medical professionals does not involve a fundamental right and therefore, a damage limitation need only be reasonably related to the state's goals to survive attack under Article I, Section 22 of the Constitution). As we have already concluded that the statute is reasonably related to furthering the State's legitimate interests outlined above, there is no violation of the constitutional guarantee of an adequate remedy.
Finally, plaintiffs argue that the constitutional concept of separation of powers has been violated because the legislature has usurped the uniquely judicial function of determining the adequacy of the remedy and the amount of damages. However, the legislature has the power to define the substantive and procedural rights of its citizens. Baton Rouge Coca-Cola Bottling Company, Ltd. v. General Truck Drivers, Warehousemen and Helpers, Local Union No. 5, 403 So.2d 632 (La.1981). As the legislature can define the substantive right, it can limit the exercise of that right without violating the separation of powers doctrine. Accordingly, we hold that the cap limitation does not constitute an impermissible intrusion on the functioning of the judiciary.
Having concluded that the cap is indeed constitutional, we next address plaintiffs' contention that Chad's general damage claim and Mr. and Mrs. Chamberlain's respective loss of consortium claims are "three claims" each subject to a separate $500,000.00 cap. The trial court ruled these claims constituted "one claim" and set the total claim for general damages for Chad and his parents at $500,000.00. Plaintiffs insist the trial court erred because there is nothing in the cap limitation that ties all recovery to one physical personal injury claim; nor does it explicitly state that loss of consortium claims are derivative. In the absence of any "limiting words" in the statute, it is asserted that each person who received personal injury is entitled to a recovery of $500,000.00.
The statute does not provide that each claimant in a personal injury suit may recover $500,000.00 in general damages. Rather, it states that "[i]n any suit for personal injury, the total amount recoverable (for general damages) shall not exceed $500,000.00." It is clear under the jurisprudence that a loss of consortium claim is only derivative, arising out of the plaintiff's injuries. It is not a separate and distinct personal injury. Malbrough v. Wallace, 594 So.2d 428, 435 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La. 1992). Under the clear wording of the statute, the trial court may not award more than $500,000.00 for general damages *1128 which arise out of the personal injury suffered by Chad Chamberlain. The trial court therefore properly refused to treat Chad's general damage claim and his parent's derivative loss of consortium claims as three separate claims each independently subject to the $500,000.00 cap.
Plaintiffs also argue that the trial court erred in refusing to award Mr. and Mrs. Chamberlain any damages for their mental pain and suffering under the doctrine of Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). However, Lejeune forecloses recovery for mental anguish in this case. The record shows that Mrs. Chamberlain was telephoned at home and told that Chad had been injured and was at the hospital several hours after the injury. At the time of the accident, Mr. Chamberlain was offshore fishing when he was alerted by the water patrol of the accident; it took him many hours to arrive at the hospital.
The first requirement for recovery of mental damages because of injury to a third person, set forth in Lejeune, Id. at 570, is that the claimant must either view the accident or injury-causing event or come upon the accident scene soon thereafter and before substantial change has occurred in the victim's condition. The Court made it clear that mental pain and anguish damages will not be allowed, for policy reasons, to those who do not view the accident or come upon the scene but rather merely learn of another's traumatic injury. Lejeune v. Rayne Branch Hospital, 556 So.2d at 570, n. 11. Mr. and Mrs. Chamberlain, who learned of their son's injury from others, are not entitled to recover damages for mental anguish under this case.
Next, DOTD asserts various challenges to Chad's general damage award. The evidence showed that as a result of the severe brain damage Chad experienced, the once active, outgoing teenager is in a vegetative state both physically and mentally. He is unable to get out of bed or move on his own accord; someone must tend to his every need. Mentally, he was described as semicomatose to having the mental capacity of a two-week-old infant. His prognosis for recovery is bleak.
Dr. Gary Glenn, who treated Chad, testified that he does indeed feel pain, especially when exposed to repetitive painful stimuli, such as his physical therapy, which consists of two one and a half hour sessions daily. Dr. Glynn and Chad's parents noted that Chad makes certain facial expressions and sounds indicative of pain. However, Chad's ability to experience and appreciate pain was described by Dr. Glynn as that of a two-week-old baby: if there is a painful stimuli, there will be a painful response; however, the ability to remember that painful incident afterwards simply is not present. The experts seemed to agree that Chad has no cognitive memory and his ability to remember anything of his prior life is severely limited.
Based on the severity of the mental injury suffered by Chad, DOTD challenges the awards for mental anguish and past, present and future physical pain and discomfort. DOTD also attacks the award for past fright as speculative because it is not known how long, if at all, Chad remained conscious after he fell in the water. Further, DOTD insists that the trial court erred in entering an award for loss of quality of life because the evidence showed that Chad has no memory of a past life and it is questionable whether he can realize what he has lost.
We need not address each of these individual categories of general damages. Beyond a doubt, Chad's general damages exceeded the statutory cap. The evidence established that Chad does feel pain; he experiences it on a daily basis and will continue to do so for the rest of his life. Those factors, taken alone, merit an award which would exceed the statutory cap. Additionally, Mr. and Mrs. Chamberlain are entitled to loss of consortium awards. Thus, the general damages to which the parties are entitled exceed the statutory cap, and this court shall not disturb the general damage award.
*1129 The trial court's special damage awards are also challenged by DOTD[1]. First, with respect to the award for future medical care, DOTD takes issue with the trial court's factual finding that Chad's life expectancy is 40 years. The record shows that the experts agreed that Chad's chances for long term survival involved a combination of factors, the principle one being the quality of care he received. Dr. Glynn opined that with excellent care, Chad could live to be fifty or sixty years old. He stated that he knew people who lived into their seventies with this type of brain injury. Dr. Donald Judice, a neurosurgeon, admitted that with quality care, Chad could live for many, many years. We find no manifest error in the trial court's evaluation of the expert testimony, and the selection of 40 years as the basis on which to compute damages.
Next, DOTD complains that the trial court erred in requiring DOTD to pay the cost of home-bound care for Chad over a 40-year period, which amounted to $1,971,000.00. Instead, DOTD suggests that the trial court should have awarded Chad only the lower cost of nursing home care. However, there was evidence that nursing home care would be detrimental to Chad and impede the chances of his long-term survival. Dr. Glynn stated that the only thing in Chad's life was his family. Aside from displacing him from a loving environment, a nursing home would not be properly equipped to treat a person with a severe brain injury. Dr. Glynn noted that facilities which specialize in treating brain injuries cost $250-300.00 per day. The record supports the award entered by the trial court.
Finally, DOTD contests the trial court's conclusion that Chad was capable of making $30,000.00 per year in entering the award for lost wages. Dr. Cornelius Gorman opined that Chad could have earned from $30,000.00 to $40,000.00 per year, noting that Chad's future seemed to be in the trade industry. Chad's father owned a machine shop and he helped his father restore old cars. Dr. Gorman did not predict any academic future endeavor for Chad, principally because of Chad's poor academic performance. On reviewing the record, we cannot say that the trial court abused its great discretion in finding that Chad's earning capacity was $30,000.00 per year.

CONCLUSION
Based on the foregoing, the judgment appealed from is affirmed in its entirety. All costs of this appeal in the amount of $943.00, are assessed to the defendant.
AFFIRMED.
LOTTINGER, C.J., concurs in the result.
NOTES
[1] In challenging the awards, DOTD relies on the depositions of three experts and a nursing home administrator which were not furnished to this court at the time the record was lodged. There is no indication that these depositions were filed in the record and the Terrebonne Parish Clerk's Office was unable to find any evidence that DOTD filed these depositions after the trial was concluded. Therefore, this evidence cannot be considered by this court in determining whether the trial court abused its great discretion in entering the awards.