619 So.2d 595 (1993)
Kevin L. THIBODEAU, et al.
v.
MAYOR AND COUNCILMEN OF MORGAN CITY, State of Louisiana, and Pelican State Mutual Insurance Company.
No. 92 CA 1050.
Court of Appeal of Louisiana, First Circuit.
April 23, 1993.
*597 Darrell J. Saltamachia, Saltamachia & Baker, Baton Rouge, and Nicholas F. Larocca, Jr., Lippman, Mahfouz, Martin & Larocca, Morgan City, for plaintiffs.
John J. Hainkel, Jr., Porteous, Hainkel, Johnson & Sarpy, New Orleans, for Mayor and Councilmen of Morgan City and Pelican State Mut. Ins. Co.
Danial C. Vidrine, Louisiana Dept. of Justice, Baton Rouge, for State.
Before EDWARDS, SHORTESS and WHIPPLE, JJ.
SHORTESS, Judge.
On June 20, 1988, 22-year-old Kevin Lee Thibodeau (plaintiff) dove headfirst into the shallow murky waters of Lake Palourde. When his head struck the muddy lake bottom, his C-5 vertebrae was compressed and crushed, rendering him an incomplete quadriplegic. Plaintiff sued Morgan City (City),[1] the lessee of the property where the accident occurred; its insurer, Pelican State Mutual Insurance Company (Pelican);[2] and the State of Louisiana (State), the owner/lessor of the property (collectively, defendants). Plaintiff's parents, Arthur Thibodeau, Sr., and Mary M. Thibodeau (Mr. and Mrs. Thibodeau), joined in the suit seeking damages for mental anguish and loss of consortium. (The three Thibodeaus will be sometimes collectively referred to as plaintiffs.)
*598 The trial court found the City and State failed to either eliminate the danger of diving accidents by erecting a barrier to diving or to reduce the danger by providing adequate signs to warn the public. The court rendered judgment in favor of plaintiff, finding him, the City, and the State equally at fault. The court dismissed Mr. and Mrs. Thibodeau's claims for mental anguish but awarded damages for loss of consortium. All parties have appealed.

I. EVIDENTIARY ISSUES
City and State have alleged two evidentiary errors which, if prejudicial, would force this court to conduct a de novo review of the record. Buckbee v. United Gas Pipe Line Co., 561 So.2d 76, 85-87 (La.1990). We thus must address these issues at the outset.

A. Admission of Testimony of Shulman
(City's Assignment of Error No. 3)
The City contends the trial court erred in permitting L. Stanley Shulman, a Florida resident, to testify as an expert in "sign interpretation" and in failing to take judicial notice that the word "risk" means "danger." When Shulman was tendered as an expert in aquatic safety, counsel for the City voiced "a [vehement] objection to any interpretation of language or signage." The court accepted Shulman as tendered, but stated, "[W]ith regard to ... any testimony he may give as to the appropriate language on signs, ... the Court will weigh that testimony based on his study or lack thereof in that area."
The trial court has the discretion to admit expert testimony which will assist him to understand the evidence or to determine a fact at issue. La.Code Evid. art. 702. Shulman testified he had not studied South Louisiana linguistics but noted that warning signs around swimming facilities are similar throughout the United States. Furthermore, Lake Palourde was promoted as a tourist attraction, making it likely that persons from outside the South Louisiana area would read the signs in question.[3] We find no abuse of the trial court's discretion in admitting the testimony of Shulman regarding the public's interpretation of the signs placed at the accident scene by the City.
The City's contention the trial judge erred in failing to take judicial notice of the meaning of the word "risk" is not an evidentiary issue at all but is simply another way of saying the trial court manifestly erred in determining the signs were inadequate. We shall defer discussion of this issue until our discussion of the City's liability below.

B. Admission of Evidence of Other Accidents
(City's Assignment of Error No. 4; State's Assignment of Error No. 5)
The City and State contend the trial court erred in admitting evidence of other accidents at Lake Palourde which they contend were irrelevant because "the circumstances, conditions and locations of these accidents are totally different." We note Hayes testified without objection that before plaintiff's accident there had been four or five diving accidents resulting in paraplegic or quadriplegic injuries in the bulkhead area included in Lakefront Parkway. Defendants thus failed to properly preserve this objection for appeal. Even if it were properly before us, we could find no error because these other accidents were clearly relevant to show the City's knowledge that crippling injuries had resulted from diving accidents in Lake Palourde.

II. MR. AND MRS. THIBODEAU'S MENTAL ANGUISH CLAIM
(Plaintiffs' Assignment of Error No. 3)
Mr. and Mrs. Thibodeau contend the trial court erred in dismissing their claims for mental anguish, which were based on Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). In Lejeune, the supreme court held that a close relation who witnesses an accident or who "come[s] *599 upon the accident scene soon thereafter and before substantial change has occurred in the victim's condition" may recover damages for mental anguish if certain conditions are met.[4]Lejeune, 556 So.2d at 570. We need not discuss those conditions in this case because Mr. and Mrs. Thibodeau do not meet the threshold requirement of witnessing the accident or coming upon the scene soon thereafter.
In Lejeune, the supreme court quoted with approval the statement of the New Hampshire Supreme Court that the emotional injury must be directly attributable to the emotional impact of the "immediate viewing of the accident victim."[5] Mr. and Mrs. Thibodeau were told of the accident by their daughter and saw plaintiff at the hospital approximately two hours after the accident, after various medical procedures had been performed. They contend, however, that the scope of the phrase "accident scene soon thereafter" should extend to "wherever the victim might be moved to within a reasonable time frame after the accident and while the victim is still experiencing the immediate trauma from the accident."
This court has previously held in Chamberlain v. State, No. 91 CA 1942, slip op. at 18, 1993 WL 225462 (La.App. 1st Cir. Jan. 20, 1993), writ granted, 615 So.2d 333 (La. 1993), that Lejeune damages are not recoverable when one learns of the accident from another and first sees the victim after he has been taken to the hospital. The supreme court's use of the term "immediate viewing" clearly indicates the term "accident scene" should be limited to the place where the accident occurred. Furthermore, even if the hospital were considered part of the "accident scene," the plaintiff's condition in this case had substantially changed when he was seen by his parents. See Bernard v. State, 563 So.2d 282, 286-287 (La.App. 4th Cir.1990), overruled on other grounds by Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The trial court did not err in dismissing Mr. and Mrs. Thibodeau's claims for mental anguish, and we affirm that portion of the judgment.

III. IMMUNITY STATUTES

A. Recreational Immunity
(State's Assignment of Error No. 4; City's Assignments of Error Nos. 7 & 8)
Defendants argue the trial court erred in failing to find them immune from liability under LSA-R.S. 9:2791 and 9:2795, commonly referred to as the "recreational immunity statutes." In Monteville v. Terrebonne Parish Consolidated Gov't, 567 So.2d 1097 (La.1990), the supreme court held the recreational immunity statutes did not apply to public lands. Defendants contend that Monteville is wrong and that it is unfair and inequitable to apply Monteville retroactively.
The Louisiana Supreme Court gave short shrift to this argument in Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The plaintiff in Socorro was injured in 1983, seven years before the Monteville decision. However, the supreme court held the recreational immunity statutes afforded no immunity to the public defendant in that case, citing Monteville. Socorro, 579 So.2d at 944. Likewise, we find the recreational immunity statutes did not protect the State or City from liability in this case.

B. Discretionary Immunity
(City's Assignment of Error No. 9)
The City contends the trial court committed manifest error in failing to apply LSA-R.S. 9:2798.1, the discretionary immunity statute, to relieve the City of liability. Section B of that statute provides: "Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when *600 such acts are within the course and scope of their lawful powers and duties." The City contends its decision not to prohibit diving and its choice of language for the signs were discretionary acts which fall within the scope of R.S. 9:2798.1.
Whether a choice made by a governmental entity is a policy-making decision as contemplated by the discretionary immunity statute is a question of fact. Chaney v. National R.R. Passenger Corp., 583 So.2d 926 (La.App. 1st Cir.1991). Although the trial judge made no express ruling on this issue, we must assume that since he held the City liable, he found the City was not performing a discretionary or policy-making act.
Dale H. Hayes, city attorney for Morgan City since 1976, testified that in 1983 he met with the City's mayor and the mayor's chief administrative officer to discuss the City's inability to obtain liability insurance. At that meeting, they discussed whether to prohibit diving at Lakefront Parkway, the area where this accident occurred. Hayes testified: "A policy decision was made by the Mayor that it would not be appropriate to attempt to prohibit swimming or diving...." The reason for this decision was because "it would cease to become a recreational area if we did that." Instead, after a meeting in 1985, the City placed signs containing language recommended by Hayes at the site which read: "Swim and dive at your own risk. Morgan City has no liability insurance."
The City's decision to maintain Lakefront Parkway as a recreation area rather than close it to swimming and diving may have been a policy decision protected by R.S. 9:2798.1. However, once the policy decision to keep the area open to recreation had been made, the City had a duty to warn recreational users of the dangers of diving into the shallow water. While the City had a certain amount of discretion in determining the language to be used on the signs, any decision regarding the language to be used to warn recreational users of the danger was operational in nature and not protected by the discretionary immunity statute. See Chaney, 583 So.2d at 929-930; Valet v. City of Hammond, 577 So.2d 155, 166 (La.App. 1st Cir.1991). Thus, the trial judge was not clearly wrong in finding R.S. 9:2798.1 did not protect the City from liability in this case.

IV. LIABILITY
(Plaintiffs' Assignment of Error No. 2; City's Assignments of Error Nos. 2 & 3; State's Assignments of Error Nos. 2, 3 & 6)
The trial court found plaintiff, the City, and the State each 33 1/3 at fault. Plaintiff contends the trial court was manifestly erroneous in finding he was guilty of any fault, while defendants contend the trial court committed manifest error in failing to find plaintiff was 100% at fault. Under a traditional duty/risk analysis, we must view the defendants and plaintiff as individual and unique social actors, taking into account the conduct of each party and the peculiar circumstances of the case. Socorro, 579 So.2d at 938.

A. Cause-in-fact
In any duty/risk analysis, the court must first determine whether the conduct in question was a cause-in-fact of the resulting harm, i.e., whether it was a substantial factor in bringing about the harm. Socorro, 579 So.2d at 939; Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962). In this case, the trial court correctly found that the conduct of each of the three parties was a substantial factor in bringing about plaintiff's injury. The City and State's failure to warn created an unreasonable risk of harm, while the plaintiff's failure to ascertain the safety of his dive by checking the depth of the water was also a substantial factor in causing his injuries.

B. Duty
The second inquiry in the duty/risk analysis is what, if any, were the duties owed by the respective parties. We must look at the conduct of each party individually to make this determination.
*601 Plaintiff contends he had no duty to avoid a diving injury because he was guilty of "mere inattentiveness." Our courts have uniformly held, however, that it is the primary duty of a diver to ascertain the safety of such an inherently dangerous activity. Socorro, 579 So.2d at 939; Stuart v. Morgan City, 504 So.2d 934, 938 (La. App. 1st Cir.1987).
Defendants contend they had no duty to plaintiff because the recreational immunity statute relieved them of this duty. This contention was rejected above. In the alternative, they contend they had no duty to warn plaintiff, an experienced diver, of the inherent danger of diving into a natural body of water. This "no duty" argument, which focuses on the knowledge and conduct of the plaintiff, was rejected first in Murray v. Ramada Inns, 521 So.2d 1123, 1135-36 (La.1988), and again rejected in Socorro. Although the Socorro court noted at 579 So.2d at 941-942, quoting Murray, that "`a potentially dangerous condition that should be obvious to all comers is not, in all instances, unreasonably dangerous,' " we find that under the facts of this case defendants had a duty to warn plaintiff.
The State also argues it had no duty to plaintiff because the "garde" of the accident site was transferred from the State to the City under the lease agreement. The lease provides that the City "assumes responsibility ... for the condition and operation of the premises...." The lease further provides that the City "agrees to always maintain the property in good condition, reserving to [the State] the right to enter and inspect the leased premises at any time, all in the best interest of the public." The State contends this contractual language transferred all responsibility for erection of warning signs to the City.
In Olsen v. Shell Oil Co., 365 So.2d 1285, 1292 (La.1978), our supreme court held that a property owner may not transfer garde by contract. A lease such as the one herein affects only the relationship between the State and the City; it cannot affect the independent duty owed by the State. Miller v. Great Atl. & Pac. Tea Co., 510 So.2d 695, 696 (La.App. 1st Cir.), writ denied, 513 So.2d 1213 (La.1987); Bolin v. National Tea Co., 359 So.2d 690 (La.App. 1st Cir.), writ denied, 362 So.2d 577 (La.1978). Furthermore, the State retained the right to inspect the premises. The State could not contractually divest itself of its duty to warn recreational users of the danger of diving into the shallow water, and, and under the facts of this case it clearly did not do so.

C. Breach

1. Plaintiff

As stated above, plaintiff had the primary duty to ascertain the safety of the waters into which he dove. As a child, plaintiff was taught to swim by his father, who warned him of the danger of diving into shallow water.[6] Mr. Thibodeau, a Coast Guard veteran, testified he told his son to check the water before he dived. In his opinion, plaintiff was a good diver.
Plaintiff joined the Coast Guard when he was 17 years old and served for three years. He testified that once he joined the service, he "took the water like fish does." He was trained to dive in the Coast Guard, and received further diving training while studying to be a diver tender at Young Memorial Technical Institute (vo-tech). He stated he knew not to dive in water of unknown depth.
Plaintiff testified he had never swum or dived in Lake Palourde before this accident. He had taken his sisters there before, but he had just dropped them off without getting out of his car. On the day of the accident, he got out of his car and walked to the bulkhead. He saw two people in the water about 20 feet straight in front of him in chest-deep water. Without any further thought he dove headfirst into *602 the water. He testified the dive was "just spontaneous."
Shulman, plaintiff's aquatic safety expert, testified that if people are walking in the water, "you get an idea of the depth if you're being even the slightest bit careful." Plaintiff knew the danger of diving into unknown water, but on the date of the accident, he was not even "the slightest bit careful." Based on these facts, we find the trial judge was not clearly wrong in finding plaintiff breached his duty to ascertain whether it was safe to dive into Lake Palourde. Plaintiff's contention that "mere inattentiveness" is not a breach of duty is clearly without merit.

2. The City

Lake Palourde is an 18-square-mile natural lake located in St. Mary and St. Martin Parishes. Louisiana Highway 70 runs along the north shoreline of the lake. The Atchafalaya River levee runs along the other side of La. 70. In 1972 the City leased from the State an area adjacent to the Atchafalaya River levee and a portion of the lake bottom for use as a recreational area. Another lease with the State was executed in 1977 which was in effect at the time of this accident. The highway shoulder was covered with shells, which provided easy parking for recreational users. There was also a bulkhead along the area of the lake adjacent to La. 70 which the City knew was a popular area where people congregated. This area was known as Lakefront Parkway.
The City was aware that the entire lake is shallow. Larry P. Bergeron, the chief administrative officer of Morgan City since 1983, testified the City knew that the depth of the lake varies from two to six feet and that the water is always so muddy it is impossible to see the bottom. Hayes and Bergeron both testified the City was absolutely aware the area was being used for diving.
In 1977, 11 years before the accident, the mayor, Hayes, and the chief administrative officer met to "review safety in the city," including Lakefront Parkway. The meeting was precipitated by the threat of cancellation of the City's liability insurance. The City decided that, due to the possibility of diving injuries, it would restrict public access to a stand which had been erected to judge powerboat races and place signs prohibiting diving in the area of the judges' stand. The City decided to continue to allow diving elsewhere along Lakefront Parkway, even though the water was just as shallow everywhere else as it was in front of the judges' stand. Instead, the City erected signs along the bulkhead area stating: "Swim and Dive at Your Own Risk."
In 1982 Danny E. Van Pelt dove from the bulkhead and broke his neck, rendering him a quadriplegic.[7] City officials met in 1983, discussed whether to prohibit diving at Lakefront Parkway, and again decided to permit diving everywhere except the judges' stand. By the time city officials met again to discuss this issue in 1985, they knew between four and six individuals had been rendered paraplegic or quadriplegic as a result of diving injuries in the shallow waters of Lake Palourde. The City again discussed this problem and decided to continue to allow diving, using this rationale, as stated by Hayes:
[L]et's understand this. Over the years, literally hundred[s] of thousands of people have used that area. Now, one paraplegic or quadriplegic is too many, but five or six out of a large population usage of that area, I did not consider, and I do not consider that now to be of sufficient reason to shut the place down, or to say, no swimming and no diving.
At Hayes' direction, however, the language on the signs was changed to read: "Swim and Dive at Your Own Risk. City of Morgan City Has No Liability Insurance." Hayes testified the purpose of these signs was to warn persons visiting Lakefront Parkway that it was dangerous to dive at that location. Three years later plaintiff was injured.
*603 The City contends it complied with its duty to warn the public of the shallowness of the lake by its erection of the "dive at your own risk" signs. It contends that we should take judicial notice that "risk" means "danger," and that since the risk most commonly associated with diving is breaking one's neck in shallow water, the signs provided adequate warning.
The trial court found that the signs "simply advise that no lifeguard is provided and the owner intends to accept no responsibility." We agree. The word "risk" is defined in Black's Law Dictionary (5th ed. 1979) as follows: "In general, the element of uncertainty in an undertaking. Risk may be moral, physical or economic." When the two sentences on the signs are read together, they seem to indicate an economic, rather than a physical, risk.
The particular risk in this case, the shallow water, was not obvious to the casual observer due to the turbidity of the water, and the signs did nothing to point out this risk. Furthermore, Shulman testified that people today do not have an appreciation of the inherent danger of diving into shallow water. A visitor to Lakefront Parkway may have thought the "risk" referred to on the sign was scraping oneself on a cypress root or being bitten by a snake.[8]
We find the trial court was not clearly wrong in finding the signs at Lakefront Parkway were inadequate. The lack of adequate signs clearly was a breach of the City's duty to the public, and to plaintiff, to warn that diving in the shallow water could result in crippling injuries. The failure of the City to take the "minimal and inexpensive"[9] preventive measure of posting an adequate warning sign was unreasonable considering the probability and magnitude of the potential harm. See Socorro, 579 So.2d at 940.

3. The State

The State reserved the right to enter and inspect the leased property, Lakefront Parkway. Carl L. Morgan, the State's Public Lands Utilization Manager, testified, however, the only inspections he conducted were "simply drive-by inspections" in which he checked for blatant violations of the lease. He did not know if anyone else from the State ever inspected the property. Morgan stated the State had never checked whether the signs were adequate.
Although Hayes testified the State was named a co-defendant in the several lawsuits arising from diving accidents at Lake Palourde, Morgan professed no knowledge of those accidents. He stated that such suits were handled for the State by the Attorney General, and there was no vehicle in place to inform him of such suits.
While the City had the primary responsibility for maintaining this property, the State, as owner, also had a duty to protect the public from unsafe conditions. The State failed to make any effort to ensure adequate warning signs were in place. The trial court was not clearly wrong in finding the State breached its duty to plaintiff.

D. Scope
The final inquiry of the duty/risk analysis is whether the risk, and harm caused, were within the scope of protection afforded by the duty breached. A risk is within the scope of a duty if the harm could reasonably be anticipated arising in a particular manner. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 623 (1972). Considering the plaintiff's knowledge and training, he could reasonably have anticipated the risk of a crippling injury from diving into unknown waters. That risk was within the scope of the plaintiff's duty to ascertain water conditions before diving.
Considering the City's and the State's knowledge of previous diving injuries in Lake Palourde and their knowledge that the bulkhead continued to be used by visitors *604 to Lakefront Parkway as a diving platform, the risk of another crippling diving injury occurring because of the lack of adequate warning could reasonably have been anticipated by defendants. The risk was thus well within the scope of their duty.

V. QUANTIFICATION OF FAULT
The trial court found the plaintiff, the City, and the State each 331/3% at fault. Plaintiff contends the assessment of fault against him is too high; defendants contend plaintiff's assessment is too low. The trial court's apportionment of fault may be disturbed only in the event of manifest error. Socorro, 579 So.2d at 942; Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 972 (La.1985).
Our comparison of the relative duties of the plaintiff, the City, and the State convinces us the trial court was manifestly erroneous in its apportionment of fault; the plaintiff should be assigned a significantly higher degree of fault than 331/3%, and the State's fault should be the least of the three parties.
The facts in Socorro are very similar to those in this case. The trial court recognized the similarity to Socorro but found the plaintiff herein less at fault than the plaintiff in Socorro because defendants were aware of the danger while plaintiff's conduct resulted from inadvertence. While defendants herein are more culpable than the defendants in Socorro because of their specific knowledge of danger, the plaintiff in Socorro acted through inadvertence. The supreme court did not excuse this inadvertence but held plaintiff to a higher duty than the City, stating:
We have stated that "[a]ny person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have." The duty to recognize and take reasonable precautions to prevent harm to oneself is especially applicable to the inherently dangerous activity of diving into natural bodies of water. Although the City was negligent in not warning of the submerged rip rap under the shallow waters off the Point, most conceivable instances of actual harm that could result from the City's negligent omission would require a diver acting in an even more negligent manner than the City. In other words, the unreasonably dangerous conditions at the Point due in part to the sudden absence of warning or prohibitory signs did not in and of itself cause harm; while the City's failure to warn was a partial cause, the injury suffered by Socorro was in most part caused by his own negligent conduct.
Socorro, 579 So.2d at 942-943 (emphasis added) (citation omitted).
Based on the facts set forth above, we reapportion the fault as follows: 67% to plaintiff; 22% to the City; and 11% to the State.[10]

VI. QUANTUM

A. General DamagesLegal Cap
The trial court found plaintiff suffered general damages totalling $3,500,000.00. This figure is not contested on appeal. Reducing plaintiff's recovery by his percentage of negligence decreases his general damage award to $1,155,000.00. However, because of the legal cap provided by LSA-R.S. 13:5106, plaintiff cannot recover the entire amount.

1. Constitutionality

(Plaintiffs' Assignment of Error No. 1)
LSA-R.S. 13:5106 sets forth limitations on judgments against the state, state agencies, and political subdivisions. Section (B)(1) of the statute provides: "In any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and *605 loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars." Plaintiff contends this statute is unconstitutional because it violates the equal protection clauses of the United States and Louisiana constitutions and because it violates Louisiana's state constitutional abrogation of sovereign immunity.
The equal protection argument was rejected by the Louisiana Supreme Court in the context of the statutory cap on general damages in medical malpractice suits in Butler v. Flint Goodrich Hospital, 607 So.2d 517 (La.1992). This court applied the Butler analysis to a challenge to the constitutionality of R.S. 13:5106 in Chamberlain v. State, No. 91 CA 1942, slip op. at 14-16, 1993 WL 225462 (La.App. 1st Cir. Jan. 20, 1993), writ granted, 615 So.2d 333 (La. 1993).
Chamberlain also addressed the sovereign immunity argument, applying the analysis used by the Louisiana Supreme Court in Sibley v. Board of Supervisors, 462 So.2d 149 (La.1985). The plaintiff in Sibley challenged the constitutionality of the cap on medical malpractice awards against the state, contending the cap unconstitutionally relieved the state of a part of its liability in violation of Article XII, Section 10(A) of the Louisiana Constitution. The supreme court found nothing in the waiver of immunity provision which would prohibit the legislature from limiting in any respect recoverable damages against the state. In Chamberlain, this court found that the limit on recoverable damages against the state in R.S. 13:5106 does not offend Article XII, Section 10(A). Slip op. at 14.

2. "Total Amount Recoverable"

(Plaintiffs' Assignment of Error No. 4; City's Assignment of Error No. 6; State's Assignment of Error No. 8)
The trial court found LSA-R.S. 13:5106 limited plaintiff's damages to $500,000.00 in general damages from each defendant, or a total of $1,000,000.00 in general damages. The trial court also awarded Mr. and Mrs. Thibodeau $6,666.66 each (2/3 of $10,000.00) without any discussion of whether the legal cap applied to their awards. Defendants contend the trial court erred in failing to limit the total general damages awarded in this suit to $500,000.00. Plaintiffs contend, however, that R.S. 13:5106 is ambiguous and should be construed in plaintiffs' favor.
We find nothing ambiguous in the language of R.S. 13:5106. Louisiana Civil Code article 9 provides that when a law is clear and unambiguous and its application does not lead to absurd consequences it shall be applied as written. The phrase "total amount recoverable" means exactly what it saysthe total amount that may be recovered as a result of Kevin Thibodeau's injury is $500,000.00. See Chamberlain, slip op. at 17. Thus, the trial court committed legal error in awarding damages in excess of the statutory cap.
Mr. and Mrs. Thibodeau contend the damages awarded to them for loss of consortium are inadequate. However, their claims are derivative, arising out of their son's injuries. Their claims against defendants are restricted to the monetary limits of the legal cap. Those limits have been exhausted by Kevin Thibodeau's claim. Thus, Mr. and Mrs. Thibodeau's claims for loss of consortium have been extinguished. Chamberlain, slip op. at 17; Glankler v. Rapides Parish School Board, 610 So.2d 1020, 1035-1036 (La.App. 3d Cir.1992); cf. Malbrough v. Wallace, 594 So.2d 428, 435-436 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La.1992).

B. Special Damages
(City's Assignment of Error No. 5;
State's Assignment of Error No. 7)
The trial court found plaintiff sustained the following special damages:

Past medical expense $ 156,770.53
Past lost income $ 51,918.17
Future loss of income $ 603,256.46
Future medical expense $2,618,564.00

Defendants contend these special damage awards are excessive and unsupported by the evidence at trial.

*606 1. Past lost and future loss of income

Plaintiff had a very checkered employment and educational background before this accident. He dropped out of Helena High School in Montana, where he was a "D" and "F" student, in the tenth grade. He joined the Job Corps, a government program, where he studied building maintenance and earned his GED. At 17, planning on a military career, he dropped out of the Job Corps and joined the Coast Guard. While in the Coast Guard he painted boats and repaired engines. He was forced out of the Coast Guard after three years because he tested positive on a drug screen. He then served six months in jail in Michigan for issuing worthless checks.
After he was released from jail, he moved to Louisiana to live with his parents. After three months of courses at a drug rehabilitation and mental health center he got a minimum-wage job as a night dishwasher at a restaurant. He also enrolled in a program at the local vo-tech to become a diver tender. He spent part of the day in the classroom and two to three hours a day receiving on-the-job training at Oceaneering International, an oil field service diving company.
A few weeks before the accident he was fired from his dishwashing job. He worked his first full day as a tender for Oceaneering, earning $4.00 per hour, on the day of the accident. He had not completed the vo-tech course, but he testified that after the accident his father obtained the diploma for him by proving he had completed first aid and CPR, the only courses he lacked, while in the Coast Guard.
Glenn Hundley, the operations manager for Oceaneering, testified there are eight positions in the diving ranksTender II, Tender I, Diver Tender, Diver III, Diver II, Diver I, Supervisor, and Superintendent. Plaintiff was classified as a Tender II, the beginning level in the diving ranks. Hundley testified there is an "exceedingly high turnover" among diver tenders, especially in the beginning levels. While it is possible to progress through the ranks from Tender II to Superintendent, his "honest guess" is that only one person in seven moves up the ladder from Tender II to Diver III, and only one in seven moves from Diver III to Superintendent. Hundley testified many people stop at a lower level and remain there for years.
The trial court relied on the testimony of plaintiff's expert economist, Dr. Seymour S. Goodman, in awarding damages for past lost and future loss of income. Goodman's calculations are based on the assumption plaintiff would have steadily moved up through the diving ranks, eventually becoming a superintendent. Defendants contend Goodman's figures are skewed because they are based on this highly speculative assumption. The State contends that rather than assuming plaintiff would have become a diving superintendent, we should assume he can now complete the college level training he needs to become a rehabilitation counselor. Ignoring the fact that plaintiff functions on an eighth-grade educational level and his treating physicians have testified he is unemployable, the State contends we should award plaintiff little, if any, damages for future loss of wages because as a rehabilitation counselor he will earn more than he was earning as a dishwasher before the accident.
While damages for loss of earnings can never be calculated with complete certainty, we feel that both plaintiff's and the State's scenarios are beyond the realm of legal probability. The trial court was manifestly erroneous in its fact finding that plaintiff's past lost and future loss of earnings exceeded $655,000.00.
Goodman testified that if plaintiff's lost wages were calculated using a starting figure of $4.00 per hour, a 9% growth rate and an 8% discount rate, his past and future wage loss would total approximately $330,000.00, which, in our opinion, is an appropriate award for past and future wage loss, given plaintiff's background and prognosis.

2. Past Medical Expenses

Only the State contests the award of past medical expenses. It contends this award is unsupported by the evidence. *607 However, plaintiff introduced evidence of his past medical expenses into evidence, and the State offered no countervailing evidence. This contention is totally without merit.

3. Future Medical and Related Expenses

Plaintiff presented the testimony of Nathaniel E. Fentress, an expert in vocational rehabilitation counseling and life care planning, regarding the cost of plaintiff's future care. Defendants also produced an expert in this field, Craig L. Feldbaum. Other than the $10,000.00 sum included in Fentress's figures for the cost of an adoption, Feldbaum basically agreed with Fentress's assessment of plaintiff's future needs.[11]
Defendants contend plaintiff's future medical needs are $1,386,308.00, based on the testimony of defendant's expert economist, Roger L. Burford, rather than the figure awarded by the trial court of $2,618,564.00. The trial court's award is $10,000.00 less than the discounted sum calculated by economist Goodman, based on Fentress's figures for future care. Burford's figure is also based on Fentress's figures, but with a different growth rate and discount rate.
The trial court has much discretion to evaluate the testimony of expert witnesses. We find no abuse of the trial court's discretion in relying on the testimony of Goodman rather than of Burford.

VII. DENIAL OF CITY'S MOTION FOR NEW TRIAL
(City's Assignment of Error No. 10)
On January 31, 1992, the City filed a motion for a new trial which simply reiterated the legal grounds originally rejected by the trial court. This motion was denied on February 3, 1992. The following day, the City filed a second motion for new trial which alleged the City had been contacted by unnamed persons who alleged the accident occurred in a manner different from that described by plaintiff and his witnesses at trial. The second motion was "verified" by an affidavit signed by the City's counsel which simply stated he had discovered important evidence which could not have been discovered earlier in the exercise of due diligence. On February 10, 1992, the trial court denied this motion because the supporting affidavit did not contain sufficient information to identify the witnesses or the facts allegedly discovered, nor did it explain what efforts the City made to discover the evidence and why it was unsuccessful.
On February 13, 1992, the City moved for rehearing on the second motion for new trial. It attempted to correct the defects of the first motion by giving more details of the facts allegedly discovered and explaining why it could not have discovered the information earlier. The verification affidavits attached, which were executed by the mayor and Hayes, the city attorney, still did not name the persons who allegedly contacted city officials. On February 25, 1992, the motion for rehearing was denied. The trial court stated in written reasons that the Louisiana Code of Civil Procedure did not provide for a motion for rehearing on a denial of a motion for new trial. The court further stated that since the "newly discovered evidence" was neither admissible nor reliable, it could not be "important to the cause" as required by Louisiana Code of Civil Procedure article 1972(2).
The City in brief does not address the trial court's finding that a motion for rehearing of the denial of a second motion for new trial is impermissible under the Code of Civil Procedure. In Palmer & Palmer v. United Inv. Corp., 255 So.2d 611, 612 (La.App. 1st Cir.1971), writ denied, 260 La. 689, 257 So.2d 151 (1972), this court stated: "Neither the Louisiana Code of Civil Procedure nor any other law within our ken or to which we have been cited *608 countenances or permits the filing of a second motion for a new trial by the party who has been denied relief on his first motion." Palmer was followed by this court in Watermeier v. Board of Trustees, 292 So.2d 874, 876 (La.App. 1st Cir.), writ denied, 294 So.2d 836 (La.1974), and by the Fifth Circuit in Correa v. HCA Health Services, 525 So.2d 1206, 1207 (La.App. 5th Cir.1988).[12] Likewise, we find no authority for the filing of a motion for rehearing on the denial of a motion for new trial.
Ignoring this procedural issue, the City contends on appeal that the trial court erred in denying the motion without a hearing. However, the Louisiana Supreme Court held in Sonnier v. Liberty Mut. Ins. Co., 258 La. 813, 248 So.2d 299 (1971), that a contradictory hearing is not required by Louisiana Code of Civil Procedure article 1971. See also Succession of Morvant, 578 So.2d 549, 554 (La.App. 3d Cir.1991); Gennings v. Newton, 567 So.2d 637 (La. App. 4th Cir.1990). Although in certain cases a contradictory hearing may be required, we find, as did the trial court, that the allegations in this case do not rise to that level.
Failing in that argument, the City then relies on equity to insist that a new trial should have been granted. The granting of a new trial is a matter left largely within the much discretion of the trial court. The trial court's decision will be disturbed only if that discretion is abused. Lamb v. Lamb, 430 So.2d 51, 53 (La.1983); In re Succ. of Bright, 197 La. 251, 1 So.2d 94 (1941). We find no abuse of that discretion. The affidavits of the mayor and city attorney in support of the motion for rehearing contain hearsay upon hearsay[13] and give no explanation for the City's failure to discover this evidence before trial. If the testimony of plaintiff and all of his fact witnesses was complete perjury, as insinuated by the City in its motion, surely the City could have gained some inkling of this fact during the four years between the accident and the trial. This assignment of error is totally meritless.
In their answer to appeal, plaintiffs requested an award of attorney fees against the City for having to respond to this assignment of error.[14] Even if we were to find the City's arguments frivolous,[15] this court has held damages will not be awarded when partially frivolous grounds are urged on appeal if the appellant is accorded at least part of the relief requested based on a meritorious ground. Starwood v. Taylor, 434 So.2d 1236, 1238 (La.App. 1st Cir.1983); Galloway v. Minckler, 63 So.2d 891, 892 (La.App. 1st Cir. 1953). See also Comment, Damages for Frivolous Appeal, 45 La.L.Rev. 137, 145 (1984). Since the City has prevailed on several issues hereinabove, we could not award damages for frivolous appeal of this issue.

VIII. CONCLUSION
For the foregoing reasons:
*609 (1) the judgments of the trial court denying the motion for new trial and the motion for rehearing are affirmed;
(2) the judgment of the trial court dismissing Arthur Thibodeau, Sr., and Mary M. Thibodeau's claims for mental anguish is affirmed;
(3) the judgment of the trial court awarding damages to Arthur Thibodeau, Sr., and Mary M. Thibodeau for loss of consortium is reversed and rendered in favor of defendants, dismissing the claims of Arthur Thibodeau, Sr., and Mary M. Thibodeau, with prejudice;
(4) the judgment of the trial court quantifying the fault of the parties is modified so that fault is apportioned as follows: 67% to plaintiff; 22% to the City; and 11% to the State;
(5) plaintiff's damages for past lost and future loss of wages are reduced to $330,000.00;
(6) in all other respects, the special damages found by the trial court are affirmed;
(7) the liability of the City and the State for general damages is limited to a total of $500,000.00 as required by R.S. 13:5106; and
(8) plaintiffs' request for damages for frivolous appeal is denied.
The judgment is hereby amended to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of defendants, Morgan City, Pelican State Mutual Insurance Company, and the State of Louisiana, and against plaintiffs, Arthur Thibodeau, Sr., and Mary M. Thibodeau, dismissing their demands with prejudice, with costs of trial and appeal to be borne by Arthur Thibodeau, Sr., and Mary M. Thibodeau.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the damages of plaintiff, Kevin L. Thibodeau, are set as follows:

General damages $3,500,000.00
Past medical expenses 156,770.53
Future medical expenses 2,618,564.00
Past and future loss of
 income 330,000.00
 _____________
Total special damages $3,105,334.53

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Kevin L. Thibodeau, and against defendants, Morgan City and the State of Louisiana, in solido, in the sum of $500,000.00, representing the general damages due plaintiff as limited by LSA-R.S. 13:5106, together with interest at the rate of 6% from date of judicial demand, June 6, 1989, through January 24, 1992, the date of judgment, and thereafter until paid at the rate of interest set forth in Louisiana Civil Code article 2924.[16]
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Kevin L. Thibodeau, and against defendants, Morgan City and Pelican State Mutual Insurance Company, in solido, in the sum of TWO HUNDRED NINETY-ONE THOUSAND, TWO HUNDRED THIRTY-FOUR AND 32/100 ($291,234.32) DOLLARS, representing the limits of the liability policy issued by Pelican State Mutual Insurance Company to Morgan City, together with interest at the rate of 6% from date of judicial demand through date of judgment, and thereafter until paid at the rate of interest set forth in Louisiana Civil Code article 2924.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Kevin L. Thibodeau, and against defendant, Morgan City, jointly and severally, in the sum of $391,939.27, representing 22% of plaintiff's special damages of $3,105,334.53, ($683,173.59) less the sum which it is solidarily liable with Pelican State Mutual Insurance Company ($291,234.32), together with interest at the rate of 6% from date of judicial *610 demand through date of judgment, and thereafter at the rate of interest set forth in Louisiana Civil Code article 2924.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of plaintiff, Kevin L. Thibodeau, and against defendant, the State of Louisiana, jointly and severally, in the sum of $341,586.79, representing 11% of plaintiff's special damages of $3,105,334.53, together with interest at the rate of 6% from date of judicial demand through date of judgment, and thereafter at the rate of interest set forth in Louisiana Civil Code article 2924.
Costs of this appeal of $1,644.29 are apportioned 67% to Kevin L. Thibodeau, 22% to Morgan City, and 11% to the State of Louisiana.
REVERSED AND RENDERED IN PART, AFFIRMED IN PART, AMENDED IN PART, AND AS AMENDED, AFFIRMED IN PART.
NOTES
[1] Plaintiff named "The Mayor and Councilmen of Morgan City" as defendants. After the court rendered judgment in favor of "Morgan City," plaintiffs filed a motion for partial new trial seeking, among other things, to correct this "clerical error" in the judgment. The trial judge denied this portion of the motion, noting that under Home Rule Charter § 1-01 the legal name of the municipality is "Morgan City."
[2] Pelican was placed in conservatorship after this judgment was rendered, and all pending matters against it and its insureds were stayed. The stay was lifted on October 13, 1992, for the sole purpose of permitting this appeal to proceed through the appellate process and to a final judgment.
[3] We note that a brochure published by The Atchafalaya Delta Tourist Commission describes Lake Palourde as "a popular spot for numerous water sports and activities."
[4] Most of Lejeune, including the requirement that one claiming mental anguish damages witness the accident or come upon the scene shortly thereafter, was codified by Acts of 1991, No. 782, § 1, as Louisiana Civil Code article 2315.6.
[5] Lejeune, 556 So.2d at 570 n. 11, quoting Corso v. Merrill, 119 N.H. 647, 406 A.2d 300 (1979) (emphasis added).
[6] Plaintiff's father told him that a friend had died as a result of diving headfirst into shallow water.
[7] See Van Pelt v. Morgan City Power Boat Ass'n, 489 So.2d 1346 (La.App. 1st Cir.), writ granted, 493 So.2d 627 (La.1986) (dismissed because of compromise).
[8] Mr. Thibodeau testified he would not swim in Lake Palourde because of the snakes.
[9] Bergeron testified the City made its own signs and that it would have cost no more to have created a sign reading "WarningShallow WaterCrippling Injuries May Result" than a sign reading "Swim and Dive at Your Own Risk."
[10] Because we have reapportioned the fault, the State's Assignment of Error No. 1, that the trial court misapplied Civil Code article 2324, is moot.
[11] Plaintiff is incapable of having an orgasm or ejaculating. Fentress testified that if plaintiff should desire to have a child, his only option would be adoption. However, Fentress knew of no instance where a male quadriplegic had ever adopted a child, and there was no testimony from plaintiff that he wanted to adopt a child.
[12] We are aware that in Burleigh v. State Farm Insurance, 458 So.2d 931 (La.1984), the court granted writs and ordered reinstatement of an appeal which had been dismissed as untimely because it was taken from a judgment denying a motion for reargument of a motion for new trial. We find Burleigh inapplicable herein because there is no question of timeliness of the appeal.
[13] An example of the quality of the allegations contained in the affidavits in support of the motion is as follows in this excerpt from Hayes' affidavit: "I contacted by phone an employee at Oceaneering International, Inc., who confirmed to me that conversations she had at work were that the accident as described in the newspaper account was at variance with the actual events...."
[14] In their answer to the appeal, plaintiffs also requested damages for having to respond to "Defendants-Appellants' appeal from the order of the Court fixing expert witness fees." We assume the reason this issue was not addressed in plaintiffs' brief is that neither defendant appealed from the award of expert fees.
[15] While we find no merit in the City's arguments on this issue, we cannot say the City's position is "so ridiculous or so opposed to rational thinking that it is evident beyond any doubt that it is being deliberately professed for ulterior purposes." See Parker v. Interstate Life & Acc. Ins. Co., 248 La. 449, 179 So.2d 634, 637 (1965).
[16] The original judgment provides for "legal interest." We have clarified the judgment to reflect that legal interest in suits against the state and its political subdivisions accrues at 6% per annum from date of judicial demand until the judgment is signed by the trial judge, after which it accrues at the rate fixed by Civil Code article 2924. LSA-R.S. 13:5112(C).