716 So.2d 69 (1998)
Tyrone Lemon BOWENS, et al., Plaintiffs-Appellees-Appellants,
v.
Howard PATTERSON, et al., Defendants-Appellants.
No. 97-876.
Court of Appeal of Louisiana, Third Circuit.
June 3, 1998.
Order Vacating Decision In Part On Grant of Rehearing August 19, 1998.
*71 Roy Seale Halcomb, Jr., Alexandria, for Tyron Lemon Bowens, et al.
Larry Alan Stewart, Bradley John Gadel, Alexandria, for Howard R. Patterson, et al.
Michael Thomas Johnson, Daniel G. Brenner, Alexandria, for State of Louisiana, DOTD.
Before YELVERTON, COOKS, WOODARD, AMY and SULLIVAN, JJ.
WOODARD, Judge.
This is a tragic personal injury case. The plaintiff, Tyrone L. Bowens (Bowens), broke his neck while riding as a guest passenger in an automobile driven by a friend, Howard Patterson (Patterson). At the time of the accident, Bowens was asleep in the back seat of the car. Bowens was seventeen, a senior in Jena High School, and an athlete, who was being recruited for football scholarships for the University of Southwestern Louisiana, Mississippi State University, and Northwestern University. As a result of the accident, he was rendered a quadriplegic.
Bowens filed suit against Patterson, and Patterson's liability insurer, Colonial Insurance Company of California (Colonial), and the State of Louisiana, through the Department of Transportation and Development (DOTD). Colonial was Patterson's liability insurer as a permissive driver. Bowens' parents also filed claims against the defendants for loss of consortium and for past medical expenses.
Beginning March 19, 1996, the case was tried for three days before a judge. On December 10, 1996, extensive Written Reasons *72 for Judgment were rendered, holding that the accident was the combined fault of Patterson and DOTD. The trial court apportioned their fault at twenty-five percent to Patterson and seventy-five percent to DOTD. The judgment was signed on December 19, 1996. Bowens was awarded damages in the amount of $7,332,282.17. His parents were each awarded $150,000.00 for loss of consortium and $239,827.13 for past medical expenses. The judgment included the trial court's earlier grant of Colonial's Motion for Summary Judgment, denying the plaintiffs' claims for legal interest on the damages awarded. It awarded legal interest only on Colonial's policy limits, which had been tendered earlier. On January 10, 1997, DOTD suspensively appealed the judgment. On February 5, 1997, plaintiffs devolutively appealed the judgment. Colonial answered the appeal. We affirm with amendments.

FACTS
On February 17, 1990, at approximately 5:30 a.m., Patterson was driving south on Louisiana Highway 127, which is a two-lane, undivided highway located in LaSalle Parish, Louisiana. It was dark. Patterson was driving a 1988 Ford Taurus owned by Ms. Jacqueline W. Lee. Colonial insured the automobile with a personal liability policy. Ms. Lee loaned the automobile to her brother-in-law, Joe Brown, who had given Patterson permission to drive the vehicle. In addition to Bowens were Joe Brown and Andre Jones. Earlier in the evening, Bowens had played in his high school's season ending basketball game.
The evidence established that during the evening of February 16-17, 1990, in the eight hours previous to the accident, Patterson drank two glasses of E.J. Brandy and Coke and approximately four beers. He had nothing to drink after 1:00 a.m. which was why he became the "designated driver." He testified that at the time of the accident, he was not intoxicated or asleep at the wheel.
In the early morning hours of February 17, 1990, the men were driving around Jena, Columbia, and Olla, Louisiana. After arriving in Columbia, Patterson decided to drive back to Jena. The accident occurred on this return trip to Jena on Louisiana Highway 127 between Olla and Jena, Louisiana, just south of the Mill Creek bridge.
Patterson admitted difficulty in remaining awake during the trip back from Columbia to Jena. Several times he woke up his friend, Andre Jones, to ask him to help keep him awake. Patterson admitted that three or four miles prior to the accident, he had "dozed off" a couple of times.
Approximately five miles north of Jena, Louisiana, Highway 127 curves to the left. Before reaching that curve, there is an abrupt change in the highway. The width of the travel lanes changes from twelve feet to ten feet, and the width of the shoulders changes from eight feet to two feet. The fore slope of the embankment adjacent to the shoulder changed from a shallow, gradual slope of six to one, to a steep, non-recoverable slope of two to one or three to one, with an elevation of approximately four to five feet. The construction of the shoulder and fore slope changes from improved, firm, and well-compacted aggregate to a loose, eroded, unstable material that appeared to be pit run. Further, there was no white edge striping beyond where the highway and its shoulders suddenly narrowed, whereas there was white edge striping along the highway up to that point. The combination of highway conditions existing at this accident site were unique to that one LaSalle Parish location.
Patterson testified that, as he entered the curve, the right tires of the automobile drifted off the pavement. He reacted immediately, and began to fight the steering wheel. He steered left as hard as he could but was not able to control the automobile and steer it back onto the highway. Instead, the automobile failed to respond to the steering and continued around the curve half-on and halfoff the pavement. When the automobile reached the point where the highway straightened out, Patterson was still trying to steer to the left to get the automobile back on the pavement. At that point, the tires caught traction and the automobile reentered the highway abruptly, shooting across both *73 lanes of travel and finally colliding with a large pine tree.
Everyone in the car was injured in the accident. Bowens and the others were taken to LaSalle General Hospital in Jena, Louisiana. Following an evaluation that identified quadriplegia, Bowens was transferred to St. Francis Cabrini Hospital in Alexandria, Louisiana. There, his evaluation revealed a loss of motor function below the neck, flaccidity with hypoactive reflexes, and a superficial avulsion injury to the right ankle. His cervical spine series x-rays showed a fracture at the C4-C5 levels with probable jumped facets bilaterally. The impression was of C4-C5 quadriplegia and spinal shock.
On February 22, 1990, he was taken for spinal fusion surgery and exploration. An open reduction of the C4-C5 and C6 was completed with clamp placement, and autogenous bone grafting from his left hip was accomplished. The operative findings included the transection of the spinal cord and a dural laceration.
On February 28, 1990, he was transferred to the North Louisiana Rehabilitation Hospital in Ruston, Louisiana for spinal cord rehabilitation. When he was discharged on August 30, 1990, he returned to his parents' home, where he remains dependant on them for his care. From December 17, 1990 to December 27, 1990, he was hospitalized again for problems of decubitus ulceration to the posterior leg, which required debridement and close management and hyperbaric oxygen treatments. By February 13, 1991, he had reached maximal potential from outpatient therapies.
State Trooper Willard E. Jordan investigated the accident scene. He testified that there is an abrupt change in the highway just before reaching the curve where the accident happened. Trooper Jordan testified that the shoulder at the accident site appeared to be made of loose dirt and rock combination that he called pit run. He testified that the fore slope of the shoulder was quite steep and approximately three to four feet high. According to Trooper Jordan, the right tire of the Patterson vehicle drifted off the pavement where the highway first starts to curve to the left. He substantiated that the physical facts at the accident scene were consistent with Patterson's testimony about how the accident happened. He opined that Patterson reacted very quickly, as soon as the right tires of the automobile drifted off of the pavement, which indicated to him that Patterson was alert and not asleep when the right tires of the automobile first left the pavement. According to Trooper Jordan, as the shoulder was only two feet wide, the right tires of the automobile were off the shoulder and down on the fore slope as the automobile continued around the curve, halfon and half-off the pavement. Trooper Jordan testified that the tree, which the vehicle collided with, was located within the highway right-of-way.
On February 23, 1990, Mr. Lester Mallette, a certified legal investigator, visited the accident scene. He testified concerning the sudden abrupt change in the highway just before reaching the curve where the accident happened. He said that the shoulder and fore slope were constructed of a loose pit run material that was so loose it was difficult to keep one's footing while walking on it. He testified the fore slope was very steep and estimated its height to be approximately five to six feet. He was certain that he identified the correct track of the Patterson vehicle as the automobile traversed the curve, half-on and half-off the pavement. His testimony was that the right tires did go beyond the shoulder and onto the fore slope, that there was "virtually no shoulder" at the accident site, and that the tree that the automobile collided with was located within the highway right-of-way, twenty-five feet six inches from the edge of the pavement.
Mallette returned to the accident site on May 9, 1990 and discovered that DOTD was at work reconstructing the highway. On January 29, 1991, he again returned to the accident site, this time with Mr. Duaine Evans, an expert in the fields of traffic engineering and accident reconstruction, who had been employed by the plaintiffs. Mallette testified that now the highway was totally different. The travel lanes were wider, the white edge striping was present, the shoulder had been improved and widened, and the fore slope was much flatter and less steep. *74 The most significant difference he observed in the highway was the wide improved shoulder, along with the presence of white edge striping. He also testified that since his May visit, the shoulder had been paved for a certain distance to provide a transition area.
Mr. Billy C. Sharpe had been employed by DOTD for thirty seven years. At the time of the trial, he was the district engineer administrator for District 58, which consists of six parishes, including LaSalle Parish. He testified that Highway 127 was originally constructed in 1929 as a gravel road, fifteen feet wide, with shoulders that were five feet wide. The next construction work on the highway was in 1949. It was completely rebuilt and given a hard asphalt surface. The travel lanes were ten feet wide, the shoulders were one foot wide, and the fore slope of the embankment next to the shoulder was two to one and three to one in other places.
Additional work was done twenty-six years later, beginning in April of 1974 and ending in June of 1977. Beginning north of Mill Creek bridge, which was just north of the accident site, the travel lanes were widened to twelve feet, the shoulders were improved and widened to eight feet, and the fore slope was changed to six to one.
Beginning in September 1975 and ending in May 1976, south of Mill Creek bridge, the old surface of the highway was completely removed and replaced with a new surface, two inches of binder course and one and a half inches of wearing course using hot mix was added, the width of the travel lanes remained ten feet, the shoulders were widened to two feet, and the fore slope remained two to one in some places and three to one in others.
The last construction work on Highway 127 in the area in question was approved on August 1, 1989, six and one-half months before this accident. Unfortunately, work was not commenced until May 5, 1990, a little over two months after the accident. It was completed on September 7, 1990. Sharpe testified that the project called for reconstructing Highway 127 south of Mill Creek bridge so that the travel lanes would be widened to eleven feet, improving the shoulders by widening them to six feet, adding white edge striping and paving the shoulder transition. He admitted that at the time of the accident there should have been a paved shoulder transition area that extended 200 feet to 400 feet south of Mill Creek bridge to provide protection against an automobile abruptly leaving the highway. He knew of no other section of the highway in LaSalle Parish where there existed such a sudden abrupt change in the highway, as existed at the time and site of this accident. He added that he knew of no reason why the tree in the highway right-of-way could not or should not have been removed before the accident.
On May 22, 1991, Colonial tendered its $10,000.00 policy limits plus legal interest and plaintiffs' court costs in the amount of $538.57 and filed a Motion For Summary Judgment, seeking dismissal, on May 1, 1995. Colonial sought to be relieved from its payment of interest on any award or judgment which might be rendered in excess of its $10,000.00 policy limit. The trial court granted the Motion For Summary Judgment on May 25, 1995 and ruled that the plaintiffs were not entitled to any additional interest from Colonial. At the court's suggestion, a judgment was not presented at that time. The court refused to dismiss Colonial from the suit until completion of the trial due to allegations in plaintiffs' petition for payment of costs and penalties pursuant to La.R.S. 22:658, 22:1214, 22:1217, and 22:1220. The trial court's judgment of May 25, 1995 was incorporated into the judgment on the merits.
The court held that the evidence did not establish that Patterson was negligent because of his consumption of alcohol and that it did not contribute to the accident. However, it held that Patterson was twenty-five percent at fault for the accident and should not have allowed the vehicle's right wheels to leave the paved surface of the road.
Further, it found that the evidence did establish that the state was seventy-five percent at fault for the accident. DOTD's liability was founded on either La.Civ.Code arts. 2315, 2316, and/or 2317. The trial court stated:

*75 Not only was the road not designed, constructed nor maintained according to the legislatively mandated safety standards, but this particular road, at the accident location, possessed characteristics which also created unreasonable risks of harm which contributed to the subject accident. The abrupt changes in road and shoulder characteristics for the southbound motorist, without any warning or other signs advising such motorists of the significant changes, contributed to the accident.
Additionally, the court noted that there was no evidence "whereby the Court could find that plaintiff, Tyrone Bowens, was chargeable with any fault which could either defeat his claim or proportionately reduce the amount of his recovery."
Bowens' claims against Colonial, pursuant to La.R.S. 22:658, 22:1214, 22:1217, and 22:1220, were denied.
The court awarded a total of $4,319,664.20 for future medical and rehabilitation expenses, loss of income of $50,830.00, and loss of future income totaling $289,775.00, based on Bowens earning the minimum wage, plus general damages of $2,500,000.00.
Each parent was awarded $150,000.00 for loss of consortium and a total of $239,827.13 for past medical expenses. The trial court made other awards for legal interest, expert witness fees, and deposition expenses which were taxed as costs against the defendants.
DOTD suspensively appealed the decision. Bowens and Colonial devolutively appealed. All parties alleged assignments of error.

ASSIGNMENTS OF ERROR
DOTD's ASSIGNMENTS
1. The trial court committed manifest error in concluding that the state was required to reconstruct the shoulders of Louisiana Highway 127 south of Mill Creek bridge to the then existing design standards for a new construction/major reconstruction for a class 3, a system road in 1975, when an overlay project was performed by the state on this section of Louisiana Highway 127.
2. The trial court committed manifest error in concluding that the state was required to match the design standards which were being used by the state when it performed a major reconstruction of Louisiana Highway 127 north of the Mill Creek bridge in 1974 to the overlay project which was conducted by the state south of the Mill Creek bridge in 1975.
3. The trial court committed manifest error in concluding that the state's failure to use the design standards for a new construction or a major reconstruction on the work performed by the state south of the Mill Creek bridge on Louisiana Highway 127 was a cause in fact of the accident sued upon.
4. The trial court committed manifest error in concluding that the absence of certain traffic control devices were a cause in fact of the accident sued upon.
5. The trial court committed manifest error in concluding that the state failed to establish a sufficient chain of custody of the blood sample drawn at the LaSalle General Hospital on February 17, 1990, and subsequently analyzed by the state crime lab to have been the blood sample of the driver, Howard Patterson.
6. The trial court committed manifest error in finding that the blood alcohol level of .138 at the time of the accident to not be the sole proximate cause of the accident sued upon.
COLONIAL'S ASSIGNMENT
The trial court erred in finding that Howard R. Patterson's fault was a cause in fact of the accident and otherwise assigning twenty-five percent to Howard R. Patterson, when the evidence presented clearly shows that DOTD's degree of fault should greatly exceed the seventy-five percent allocated.
BOWENS' ASSIGNMENTS
1. The trial court erred in awarding Bowens only $2,500,000.00 in general damages for quadriplegia arising out of the accident.

*76 2. The trial court erred in awarding Bowens only $4,319,664.20 for his future medical and rehabilitation expenses.
3. The trial court erred in finding that Bowens' loss of future earning capacity should be based on the assumption that if he had not been injured his future earnings would not have exceeded minimum wage.
4. The trial court erred in holding that the reenactment of La.R.S. 13:5112(C) was applicable to the facts of this case despite the fact that the accident in question happened on February 17, 1990, and the reenactment of La.R.S. 13:5112(C) did not become effective until November 23, 1995.
5. The trial court erred in holding that Colonial only had to pay interest on its policy limits.

LAW

DOTD'S ASSIGNMENTS OF ERROR
DOTD's assignments of error question factual determinations made by the trial court against it. As such, the legal standard we are required to apply in evaluating its contentions is the "manifest error/clearly wrong" test. In Syrie v. Schilhab, p. 4, 96-1027 (La.5/20/97); 693 So.2d 1173, 1176, the Louisiana Supreme Court stated:
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong, but whether the fact finder's conclusion was a reasonable one. Id. at 882. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Theriot v. Lasseigne, 93-2661, p. 9 (La.7/5/94); 640 So.2d 1305, 1313. The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).
Mindful of this legal standard for our evaluation of these issues, we will now proceed to review DOTD's assignments of error.
At the outset, we must acknowledge the outstanding work by the trial court in its analysis of this complex case of nineteen volumes and its reasons for judgment.

RECONSTRUCTING THE SHOULDERS OF HIGHWAY 127
In its Written Reasons for Judgment, the trial court concluded that the state failed to comply with existing design standards in the overlay work on Highway 127 in 1975-1976, south of Mill Creek bridge. DOTD contends that this finding was manifestly erroneous.
DOTD contends that, at the time of the State's overlay project in 1975 south of Mill Creek bridge, the state had not adopted specific standards for use in such projects. DOTD contends that with an overlay project, only overlay standards, not current design of new construction/major reconstruction standards, would be used.
Concerning this issue, the trial court's Written Reasons stated:
Meanwhile, Acts 1968, No. 276 was approved on July 20, 1968. This became LSA-RS 48:35. This statue provided:
"The department of highways shall adopt minimum safety standards with respect to highway design, construction and maintenance.
These standards shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway Officials.

*77 Hereafter, the state highway system and all public roads, highways and streets under the jurisdiction of any political subdivision of this state shall conform to such safety standards.

If any such improvement constructed by a political subdivision of this state fails to conform to such standards, payment of any funds allocated to said political subdivisions for such road construction purposed [sic] shall be withheld by the department of highways until such time as the standards established by the department are complied with."
(emphasis added; paragraphing added.)
This statute requires all public roads to comply with AASHTO safety standards, not newly just constructed roads. The penalty for a political subdivision's noncompliance is withholding of payment of funds, but that provision has no effect in the instant case.
Exhibit P-10 is the design plans for the major reconstruction of La Highway 127 north of the Mill Creek bridge. This project was designated XXX-XX-XX and the plans were approved in April, 1974. As is shown thereon, the 1973 ADT [average daily traffic] for this section of road was 600 V.P.D. [vehicles per day]. However, the project was designed and constructed as if the highway was a Class 3 road in the A system rather than a Class 5 road in the B system. It is interesting to note that the ADT south of Mill Creek bridge at station 114460 (Plaintiff's Exhibit -13) was consistently approximately 300 to 400 V.P.D. greater than the ADT at station 114470 north of the Mill Creek. P-10 also shows at the southern end of this project, the abutting project was denominated XXX-XX-XX. However, no such project plans were introduced into evidence. Exhibit P-8 shows an overlay project which was approved on September 17, 1975. This overlay project was denominated No. 127-01-09 and included the accident location. The plan was to add aggregate to the existing shoulders to bring the first two (2') to a 0.50 foot per foot (20:1 Ratio) slope, with the remainder of the four (4) foot shoulder to be brought to no more than 3:1 ratio slope. It is at this point that the state failed to bring the shoulders up to the then existing design standard for a Class 3, A system road to match the design it had incorporated into the previously approved project No. 127-02-12. At the very least, if only the road surface itself was to be overlaid and not widened, the shoulder should have been widened to eight (8') feet and constructed of aggregate to meet the minimum design of a B system, Class 5 road with a ADT of 750 V.P.D. or less.
It was not until April 29, 1977, when the State first promulgated design standards for overlay or widening and overlay of rural highway and roads, which was different from the design standards for new construction or major reconstruction of rural highways. These may still be applicable but July 6, 1982, is the last date shown for such standards in exhibit P-12. These exhibits would seem to imply that even if a road was widened and not just overlaid there would be no requirement to upgrade the shoulders. This does not make any sense and is even antagonistic to the concept of uniform construction or maintenance standards. In any case, these types of different standards were not extant in 1975 when project No. 127-01-09 was designed and completed, and therefore they are not applicable to the instant case.
In spite of what the design plans for project No. 127-01-09 called for, the evidence clearly proved that the shoulder of the highway at the accident location was not constructed of aggregate; was not a slope of 0.05 foot per foot for the first two (2) feet from the hard surface; and was not a ratio of 3:1 or less for the rem[a]inder of the shoulder foreslope....
(Footnotes omitted).
Having reviewed the record in its entirety, the above findings of fact by the trial court are not manifestly erroneous or clearly wrong.
This assignment of error is without merit.

DESIGN STANDARDS FOR HIGHWAY 127
The trial court found that, additionally, DOTD had complied with the design standards for a new construction/major reconstruction *78 in 1975-1976, when it performed the work south of the Mill Creek bridge, because this portion of the roadway adjoined another portion which had already been reconstructed to satisfy 1970's design standards. DOTD maintains that this factual finding was manifestly erroneous. It contends that merely because an adjoining area of roadway surface is being brought up to the then existing standards for a new construction/major reconstruction, this does not mean that the remainder of the road must likewise be brought up to those same standards for a new construction/major reconstruction if the state simply wanted to overlay that adjoining roadway surface. We note that DOTD's argument here is contrary to the public policy requirements of La.R.S. 48:35 requiring adoption of "minimum safety standards with respect to highway ... maintenance."
The trial court's finding in relation to this issue appears in that portion of the trial court's Written Reasons in DOTD's assignment of error number one above. Concerning that assignment, we found that the trial court's determinations were not manifestly erroneous or clearly wrong.
This assignment of error is, likewise, without merit.

THE CAUSE OF THE ACCIDENT
DOTD contends that the trial court committed manifest error in finding that the state's failure to widen the lanes from ten feet to twelve feet, extend the existing shoulder from two feet to six feet, and modify the slope south of the bridge, as well as north of the bridge was the cause of the accident. DOTD also maintains that Patterson alone was the cause of the accident.
In its Written Reasons regarding this assignment of error, the trial court stated:
North of Mill Creek bridge, the paved travel lines were twelve (12') feet in width. South of the bridge, the paved travel lanes were only ten (10') feet in width. This means the paved road was four (4') feet narrower south of the bridge.
North of Mill Creek bridge, the shoulders were up to ten (10') feet in width made of compacted aggregate with a 0.05 foot per foot (20:1 Ratio) slope and an additional six (6') feet of true foreslope with no more than a 6:1 ratio slope. Thus, beyond the paved lanes, there is up to an additional sixteen (16') feet of surface with a slope of no more than 6:1. South of Mill Creek bridge there was at most, approximately one (1') foot of loose pit run with a 20:1 ratio slope and approximately two to three more feet of loose pit run with a 1:1 ratio slope beyond the paved surface.
....
In summary, on the liability of DOTD, the Court finds as a fact that the subject road, at the time of the accident, was not designed in accordance with appropriate AASHTO safety standards, was not actually constructed according to the plans, nor maintained in a reasonably prudent fashion....
(Footnotes omitted).
The trial court then apportioned fault between the defendants at seventy-five percent to DOTD and twenty-five percent to Patterson. The court's findings of fact concerning this issue are not manifestly erroneous or clearly wrong. Its apportionment of fault is congruent with other cases having facts similar to those in the instant case. See the discussion of Colonial's assignment of error below.
This assignment of error is without merit.

TRAFFIC CONTROL DEVICES
DOTD contends that the trial court committed manifest error in concluding that the state failed to provide traffic control devices which would have prevented the accident from occurring in the manner in which it did, had they been installed. DOTD believes that the specific devices were not required under any existing standard and that some of the devices were excluded specifically due to their propensity to cause additional risks of harm to a motorist.

A. FAILURE TO ADVISE OF CHANGES IN ROAD AND SHOULDER
According to DOTD, the state's failure to provide signs regarding the road width changes and the shoulder characteristics was neither a defect nor a contributing cause of the accident; Patterson was aware *79 of the highway changes by virtue of having traveled the area on multiple occasions.
Concerning this issue the trial court stated:
The State suggested that the Court disregard the testimony of the plaintiff's "highway" expert and embrace the opinions of its expert, Dr. Blaschke. The Court declines because it was not favorably impressed with the State's expert witness' testimony on these points. It would appear that no matter how many times a driver traverses a road, the necessity of appropriate warning signs is not deleted simply because the driver actually is or should be familiar with the road. The duty to warn the motoring public of potential hazards and/or abrupt changes in the quality of a well traveled major rural collector highway is always present, irrespective of how familiar a particular driver on that road may be with such hazards and/or abrupt changes in quality.
We find no error in the court's ruling.

B. ABSENCE OF "FOG LINE"
DOTD urges that the trial court erred in finding that the absence of a fog line south of the Mill Creek Bridge was a contributing factor for the accident. In fact, says DOTD, the state should not place edge lines on highways with lanes less than ten feet wide, as this results in an increased risk of head-on collisions on roadway surfaces twenty feet or less in total width.
The trial court's findings in relation to this issue were: "North of Mill Creek bridge, there was a white `fog line' on the edge of the paved surface. South of Mill Creek bridge, there was no such line on the roadway nor were there any other markers or devices to delineate the edge of the paved roadway." A white "fog line" would have helped Patterson to maintain the vehicle on the road and would have given him considerable warning that the road was about to become narrower as the "fog line" would have been visible at some distance in his headlights.
The court's finding that the absence of the "fog line" south of the Mill Creek bridge was a contributing cause of the accident is not manifestly erroneous or clearly wrong as a contributing factor to the accident.

C. LACK OF CURVED BANKING
DOTD next notes that the court erred in holding that the lack of banking of a four degree curve contributed to the accident and that Patterson, in fact, negotiated the curve. The accident occurred when he failed to straighten his wheels after completing the curve.
Concerning this issue, the court stated in its Written Reasons: "North of Mill Creek all curves in the road were superelevated or `banked' according to the severity of the curve, see Exhibit P-10. South of Mill Creek, the subject curve was not banked at all. Instead, the road was flat with no appropriate superelevation." A `banked' curve would have provided considerable centrifugal force to Patterson's vehicle which would have helped him to adequately negotiate the curve and remain on the roadway. Thus, the trial court's finding that the lack of curved banking was a contributing cause of the accident is not manifestly erroneous or clearly wrong.

D. FAILURE TO REMOVE TREES IN THE RIGHT OF WAY
DOTD contends that the trial court erred in finding the state at fault for failing to remove the tree the car struck that was thirty-six feet five inches from the centerline of the highway. DOTD contends that as the work south of the Mill Creek bridge was overlay work and not new construction, there was no requirement that such tree be removed.
Regarding this assignment, the court stated:
North of Mill Creek all trees which were less than forty-two (42') feet from the centerline of the road were to be removed unless the project engineer found then [sic] to have "aesthetic value" (Exhibit P-10). South of Mill Creek, the tree which the vehicle collided with was thirty-six feet, five (36' 5") inches from the centerline of the road or twenty-six feet, five (26' 5") inches from the edge of the hard surfaced roadway. There was no evidence that the particular pine tree had any particular "aesthetic value."
*80 The trial court's finding of fact that this tree's location, less than the required minimum safe distance from the centerline of the highway, was a contributing factor in the accident, was not manifestly erroneous or clearly wrong.

E. LACK OF TRANSITION
DOTD maintains that the trial court erred in finding that there was no transition area going from the wider area north of the bridge to the narrower area immediately south of the bridge. DOTD contends that the lack of transition had nothing to do with the accident.
In making its determination concerning contributing causes of the accident, the court remarked:
There was no transition area where the shoulders and the hard surfaced roadway gradually tapered from the wider dimensions to the more narrow dimensions, because the transition occurred at the bridge itself and not on the road either north or south of the bridge.
A transition area would have given Patterson ample warning that the road was about to narrow so that he could adjust his driving accordingly and avoid the accident. The trial court did not commit manifest error or was not clearly wrong in finding that the lack of transition from the wider road to the narrower road was a contributing factor in the accident.
This assignment of error is without merit.

5. CHAIN OF CUSTODY OF THE BLOOD SAMPLE
DOTD contends that trial court committed manifest error in concluding that the blood sample drawn from Patterson at La-Salle General Hospital on February 17, 1990 and subsequently analyzed by the state crime laboratory could not be linked "more probably than not" to Patterson.
Concerning the Patterson's blood sample, the trial court noted:
The problem with the state's case is in the lack of sufficient proof to connect the specimen with the source, Mr. Patterson. Nurse Yaryan was emphatic in her testimony concerning the type of kit used to draw Mr. Pattersons' blood. As she explained, all kits come with a consent form, a needle, a holder for the needle and two vacuum vials in which the blood is drawn into. The only difference in the kits are the needles. The post mortem kit (BD-4991) has a longer needle. With respect to the type of kit she used for Mr. Patterson's blood samples, she testified she used a kit designed for use on live subjects:
"Q. And which kit did you utilize in this case?
A. For the live people." ...
* * * * * *
Q. The one that you utilized. You took this particular kit at the hospital, and used this particular kit in which to store blood for Mr. Patterson?
A. Yes. The one for live people, yes."
...
....
Q. In this particular case, if the evidence shows that the particular kit identified as being the kit containing blood tested by the crime lab here in Louisiana was a kit for taking blood post mortem, do I understand your testimony that kit would not have been the kit that contained Howard Patterson's blood?
A. No, Sir, I wouldn't have drawnI wouldn't have used the kit for post mortem on a live person. The needle is a little bit long for that. But it wouldn't have made any difference.
Q. So in answer to my question, if we've got a kit that's being identified that is for post mortem blood drawing, you're satisfied that would not be the kit that you put Howard Patterson's blood in; is that correct?
A. Right." ...
Nurse Yaryan's deposition also shows that she could have easily distinguished a post mortem kit from a live subject kit.
Nurse Yaryan was also very clear on her use of the signed consent form in this particular case. A consent form is inside the kit when it is opened, for use in connection with the drawing of the blood.

*81 Q. And if we've got a consent form in this case, that's not signed, then as I understand your testimony, that would not be the consent form that Howard Patterson was asked to sign; is that correct?
A. If the consent form isif the consent is not on the form that's in the kit, then I don't draw the blood.
Q. And you testified in this case that it was your recollection that Howard Patterson signed the consent form. So my question is, if the consent form we have is not signed, then it would not be the consent form that should go with the blood of Howard Patterson; is that right?
A. That's true." ...
Even though there is some evidence which would indicate that the blood sample analyzed by Mr. Shuflin was drawn from Howard Patterson, the most compelling evidence was the lack of the signed consent form in the kit and the fact that the blood sample vials were inside of a post mortem kit. It appears that Nurse Yaryan had an unusually high degree of recollection of the specifics and details of the event which occasioned her drawing of Howard Patterson's blood. Her testimony, coupled with the undocumented thirteen (13) day hiatus in the chain of physical custody lead the Court to believe that more probably than not the blood analyzed by Mr. Shuflin can not be connected to defendant Patterson.
(Footnotes omitted).
The record supports the trial court's decision, thus, its findings are not manifestly erroneous or clearly wrong.
This assignment of error is without merit.

THE SOLE PROXIMATE CAUSE OF THE ACCIDENT
DOTD asserts that the trial court committed manifest error in concluding that, assuming arguendo that the blood kit identified in the record did in fact contain the blood of Patterson, the state failed to prove that Patterson was negligent because of his consumption of alcohol. It insists that its evidence established that Patterson's blood alcohol level was 0.138 at the time of the accident and that this level of intoxication impaired him sufficiently to cause this accident.
On this issue, the court reasoned:
Assuming for the sake of argument that there was sufficient proof to connect that blood analyzed by Mr. Shuflin to defendant Patterson, the result of the test, even with the enhancement by Dr. Freeman's opinion, still does not provide sufficient evidence to show that defendant Patterson was negligent because of his consumption of alcohol. Mr. Shuflin's results of the blood alcohol test was 0.09 percent by weight of ethyl alcohol in the sample he tested. Dr. Freeman used Mr. Shuflin's results to reach his conclusion that if Mr. Patterson was average in his metabolism of alcohol, then his blood alcohol content at the time of the accident should have been 0.138 percent. Dr. Freeman readily admitted that he had not made any studies on Mr. Patterson specifically and his opinion was only for the average of the population. Dr. Freeman specifically testified that he was not an accident reconstruction specialist and was not in a position to specify how the alcohol may or may not have impaired his ability to operate a motor vehicle at the time in question. There was no credible evidence offered to interpret the blood alcohol test results found by Mr. Shuflin. The Court finds that even if the results of the blood test would have been admissible, there is no predicate for such results to prove, without further credible testimony, that defendant Patterson's ability to operate a vehicle was impaired at the time of the subject accident. The Court also finds that other evidence, discussed below, indicates that alcohol use by Mr. Patterson was not a factor contributing to the cause of the subject accident.
Further, the evidence concerning Patterson's reactions to running off the road established that he immediately tried to steer the car to the left to regain the highway, but the tires did not provide traction on the shoulder such that the car would return to the highway. His reactions were appropriate for the *82 circumstances in which he found the vehicle, which indicate he was not impaired. The court's findings of fact are not manifestly erroneous or clearly wrong.
This assignment of error is without merit.

COLONIAL'S ASSIGNMENT OF ERROR
The trial court assessed Patterson's fault at twenty-five percent and DOTD's at seventy-five percent. Colonial contends that the court erred in making these assessments and that DOTD's percentage of fault should be much higher than the seventy-five percent assessed. Colonial proffers that a more reasonable assessment of fault would be ten percent to Patterson, and ninety percent to DOTD.
The issue is subject to the "manifest error/clearly wrong" analysis. See Syrie, 96-1027; 693 So.2d 1173. Having addressed DOTD's assignments of error above relating to its fault in this case, it is unnecessary to repeat that analysis here. Primarily, in this issue, we are concerned with the trial court's assessment of fault to Patterson for this accident. In relation to Patterson, the trial court stated, after finding that his alcohol ingestion did not contribute to the accident:
This does not relieve defendant Patterson of liability. Defendant Patterson was still at fault and his fault was a cause in fact of the accident which resulted in the injuries sustained by the petitioners. The record reveals that Mr. Patterson had been awake since approximately 6:30 a.m. on February 16, 1990, a period of approximately twenty-three (23) hours prior to the accident. He readily admitted that he was tired a few hours before the accident occurred and tried to enlist the help of a guest passenger, Mr. Andre Jones, to keep him awake and alert. He also admitted that he had dozed off a couple of times prior to the accident. The Court concludes that but for defendant Patterson's severe fatigue he would have remained alert and not have allowed his vehicle's right wheels to leave the paved surface of the road to such a degree that it was next to impossible to return to the road safely given the condition of the road's shoulder.
(Footnote omitted).
We have reviewed the record in its entirety. The trial court's findings of fact regarding Patterson's fault are not manifestly erroneous or clearly wrong. They accurately summarize the evidence found in the record in relation to this issue. The trial court's apportionment of fault between DOTD and Patterson is likewise not manifestly erroneous or clearly wrong. The trial court's apportionment of fault is in line with other cases of a similar pattern of facts, as here, involving the liability of DOTD. See generally, Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607 (75% fault to DOTD, 25 % fault to driver); Campbell v. Louisiana Dept. of Transp. & Dev., 94-1052 (La.1/17/95); 648 So.2d 898 (75% fault to DOTD, 25% fault to driver); Rochelle v. State, Through Dept. of Transp. Dev., 570 So.2d 13 (La.App. 3 Cir.1990), writ denied, 572 So.2d 93 (La.1991) (80% fault to DOTD, 20% fault to driver); but see, Brown v. Louisiana Indem. Co., 97-1344 (La.3/4/98); 707 So.2d 1240 (25% fault to DOTD, 75% to driver.)
However, we consider Brown sufficiently factually distinguishable from the facts in the case sub judice not to apply its reasoning. In Brown, there was no evidence that, in running off the road, the driver attempted to regain control of the vehicle to reenter the road as Patterson attempted to do and the physical characteristics of the highways where the accidents occurred were considerably different.
This assignment of error is without merit.

BOWENS' ASSIGNMENTS OF ERROR

GENERAL DAMAGE AWARD
The trial court awarded Bowens $2,500,000.00 in general damages for his injuries. Bowens contends that this damage award is not in line with other court's awards of general damages for a quadriplegia injury and that it should be increased to $3,000,000.00.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the supreme court commented on appellate review of general damage awards and the discretion in fixing damages accorded to trial *83 courts. It also established a methodology for appellate courts to use in reviewing damage awards of a trial court. The court said:
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion.
(Citations omitted.) Id. at 1260.
The trial court findings of fact concerning Bowens' injury are as follows:
Tyrone is able to feel tactile stimuli only from the nipple level upwards. He is able to move or operate his muscles only from the clavicle level upwards. Therefore he can not stand, walk, run, twist, bend, stoop, climb, transfer from bed to wheelchair or even turn his wheel chair on. The level of his spinal cord injury resulted in losses of Tyrone's abilities to use his chest muscles and a termination of his sympathetic nervous system control below the shoulder level. This resulted in the loss of the normal sympathetic tone of his blood vessels, loss of anal muscle control, loss of bladder sphincter control, apocuthermia and autonomic dysreflexia. His loss of mobility has resulted in osteoporosis, contractures of some joints and Hypertrophic occificans of the shoulders. Additionally, he exhibited an unusual skin lesion on his left leg, had acute lung problems on two occasions following his first and his second discharge from the rehab hospital, and experienced severe, violent spasms brought on by tactile stimulation. In essence, Tyrone is completely dependant on others for his very existence, and his permanent disability has severely compromised several bodily functions.
Having reviewed the record in its entirety, the trial court's findings of fact concerning Bowens' quadriplegia are not manifestly erroneous or clearly wrong. They are absolutely accurate. The trial court's award of $2,500,000.00 in general damages was not a clear abuse of discretion. Since we have determined that the court did not abuse its discretion in the award of general damages, it is unnecessary for us to resort to prior awards to determine if the award is proper. Youn, 623 So.2d 1257. Even assuming arguendo, we were to have found an abuse of discretion, we could only resort to prior awards to determine the highest or the lowest point reasonably within that discretion. Id. The highest point for award for quadriplegia is $3,500,000.00. See Thibodeau v. Mayor & Councilmen of Morgan City, 619 So.2d 595 (La.App. 1 Cir.), writ granted in part and denied in part, 629 So.2d 362 (La. 1993). The lowest point for quadriplegia is $2,500,000.00. See Martina v. Sunrall, 619 So.2d 87 (La.App. 1 Cir.), writ denied, 621 So.2d 821 (La.1993). Bowens' award falls within the range of such awards, although on the low end.
This assignment of error lacks merit.

FUTURE MEDICAL AND REHABILITATION EXPENSE AWARD
The trial court awarded Bowens $4,319,664.20 for future medical and rehabilitation expenses. According to the testimony of Bowens' expert witnesses, who specialized in future medical and rehabilitation needs of severely injured and disabled patients and the costs of such care, the present value of Bowens' future medical expenses totaled $14,858,294.00. The trial court's award represents less than one-third of the amount calculated by the plaintiffs' experts. Bowens contends that this was an abuse of discretion and should be increased.
La.Civ.Code art. 2324.1 states: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." (Emphasis added.)
We have reviewed the evidence, and rather than merely repeat what the records show, we quote the trial court's reasons, which *84 adequately and correctly summarize Bowens' need for future care:
FUTURE SPECIAL DAMAGES
It has been proved that Tyrone's disabilities and impairment are permanent. Therefore, compensation for treatment and other necessary services and things must be awarded on a basis which reflects a period which will approximate his life expectancy. According to Dr. [Pat] Culbertson in his July 2, 1995, report, Tyrone's post accident life expectancy was estimated to be 56.5 years, but this was predicted on a July 18, 1995, trial date, rather than a March 19, 1996, trial date. However, the delay from injury to trial would also increase from 5 years to 6.0 years, but there were no special damage items incurred doing [sic] the interim period. The Court will use Dr. Culbertson's calculations which are based upon a trial to life expectancy delay of 51.0 years, which would translate into a life expectancy delay of 57 years following the accident. It is noted that there were no medical or related expenses [footnote omitted] submitted for approximately four (4) years between April, 1992 and March, 1996 trial date. However, the Court believes this is because the plaintiffs' did not have the resources to pay for these things and since Mrs. Bowens was not employed, she had no group health insurance coverage on Tyrone. As Dr. Smith mentioned, just because Tyrone hasn't had the regular recommended follow-up medical care, doesn't relieve the need, he still needs such.
The Court is sufficiently convinced that Tyrone will require numerous services, equipment, and support for the remainder of his life. His overall life care plan includes medical, therapeutic, psychological, occupational, and vocational evaluation and counselling. [sic] It also includes 24 hour per day support care and durable as well as disposable special equipment and supplies to meet the physical needs of his day to day living. Dr. Robert Voogt's plan for Tyrone's life care was used as an outline and generally accepted by the Court with a few modifications.
Medical evaluations, monitoring, and treatment as necessary will be essential to Tyrone's plan. His permanent physical disabilities and impairments will require an initial evaluation by a internist, an orthopaedic, a plastic surgeon, and a urologist. [footnote omitted] Given the awards for future specific medical and therapeutic evaluations and treatment, the Court does not believe that additional bi-annual "comprehensive"spinal cord injury evaluations are necessary. The Court does believe that the follow up visits to the various medical providers are warranted given Tyrone's level of disability and impairment and therefore makes awards for such services in accordance with the details set forth in Schedule II, item 1. of Appendix C.
[Inserted into the trial court's reasons].

 SCHEDULE II
 RECURRING EXPENSES ON ANNUAL BASIS
 ITEM PRESENT ANNUAL COSTS$
1. Future Medical Evaluations & Treatment[s]/Annual Frequen
 cy:
 Neurosurgeon/ 1 - 41.50
 Physiatrist/ 4 - 200.00
 Orthopaedic/ 2 - 111.00
 Internist/ 2 - 122.00
 Urologist/ 2 - 92.00
 Urine Tests/ 4 - 228.00
 Urodynamic Testing/ 0.5 - 300.00
 Cystoscopy/ 0.5 - 82.50
 Kidney Ultrasound/ 0.5 - 109.50 1,286.50

Future Therapeutic evaluations and treatment are required to improve and maintain Tyrone's strength, endurance and stamina and also to prevent his joints from "locking up." Occupational therapy is required to learn and maintain self-care skills. At the point when Tyrone maximizes his abilities, a vocational rehabitational (sic) evaluation should be conducted to maximize his potential. The Court is not convinced of the need for a recreational therapist beyond (1) year because of the other counseling awards afforded. The Court will not award anything for "family" counseling either because future medical awards are not allowable as such for anyone other than the injured party. For details of *85 these awards see Appendix C, Schedule I, items 2. and 3.; also Schedule II, items 2. and 3.
[Inserted into the trial court's reasons].

 SCHEDULE I
 ONE-TIME, SHORT-TERM OR NON-RECURRING
 EXPENSES
 ITEM PRESENT VALUE$
....
2. Future Therapeutic Evaluations:
 Vocational Rehab[.] 2,250.00
3. Future Counseling for 1 year:
 Self - 4,680.00;
 Occupational - 4,680.00;
 Physical - 4,680.00;
 Recreational - 4,680.00 18,720.00
 SCHEDULE II
 RECURRING EXPENSES ON ANNUAL BASIS
 ITEM PRESENT ANNUAL COSTS$
....
2. Future Therapy Evaluations/Annual Frequency:
 Occupational/ 1 - 90.00
 Physical/ 1 - 90.00 180.00
3. Future Therapy/Annual Frequency; Support Care/Rate:
 Physical/ 12 - 1,080.00
 Case manager/ 24 - 1,920.00
 Support Care/24hrs at 6.00 per hour, plus 7.65%
 Federal Social Security & Medicare
 Contributions - 56,589.60 59,589.60

The evidence indicated that a case manager was beneficial in over viewing Tyrone's initial acute treatment and rehab hospital stay. A case manager's services on a semi-monthly basis will be awarded. The Court does not believe that the necessity of a separate "Registered Nurse reviewer" is proved, given the level of the contact with medical and therapeutic personnel and the use of a case manager. Therefore, the Court will not make an award for a[sic] R.N. reviewer.
It was readily shown that Tyrone's life care needs are being satisfied by his family members at present. However, they didn't bargain to be care givers to a quadriplegic invalid and an award for life support care is appropriate. Tyrone needs twenty-four (24) hours per day, three hundred sixty-five (365) days per year life support care. The $12.00 per hour rate estimated by Doctor Voogt is excessive and assumes it will be brokered by a firm that furnishes such services. A $6.00 per hour rate for such services is appropriate, available and will be used by the Court as the basis for the award.
Dr. Voogt included in his cost report, as a non recurring cost, $33,440.00 as the estimate expense for Tyrone's college education. The Court will not make such an award because whether Tyrone was injured in the subject accident or not, college would still cost something to attend. Stated another way, the accident simply is not a cause in fact of the expenses of a college education.
As a recurring yearly cost, Dr. Voogt included the services of a handyman, a housekeeper, and a lawn maintenance person. The annual costs or expense for these maintenance services was estimated to be $5,306.00. While it is true that Tyrone will not be able to keep his house or lawn, nor will he be able to make odd job repairs around the house or lawn, there was no evidence that he did or would have done these things himself, but for the accident. The Court believes that such awards are appropriate in certain cases. However, in this case, such awards would be speculative, see appendix C, Schedule II, item 4.
[Inserted into the trial court's reasons].

 SCHEDULE II
 RECURRING EXPENSES ON ANNUAL BASIS
 ITEM PRESENT ANNUAL COSTS$
....
4. Maintenance Services: None 0.00

There is also no doubt that a wheelchair bound person has special personal transportation needs. A healthy person will incur the usual cost of a vehicle purchase. The wheelchair bound person will incur additional expenses, since a van must be modified to accommodate a wheelchair. The Court finds that the reasonable cost for modifying a van for a wheelchair transportation use is $20,000.00 and such a vehicle should last ten (10) years before replacement is necessary. Because the lift and other special features require more power, an additional battery is usually required, which should last five (5) years *86 before replacement. See appendix C, Schedule II, item 5 for details.
[Inserted into the trial court's reasons].

 SCHEDULE II
 RECURRING EXPENSES ON ANNUAL BASIS
 ITEM PRESENT ANNUAL COSTS$
....
5. Transportation Expenses/Annual Frequency
 Van Adaptation Expenses/ 0.1 -2,000.00
 Incremental Vehicle Tax/ 0.1 - 120.00
 Registration/ 1 - 40.00
 Title/ 0.1 - 2.70
 Special Battery/ 0.2 - 50.00 2,212.70

Note, there is no award for a mobile phone access charge as there was no proof that such was necessitated by the subject accident. Quadriplegia also necessitates a number of durable and disposable (one use) medical equipment and supplies. These include a wheelchair, which should last five (5) years. The battery Charger should need replacement every two (2) years. The details are shown in appendix C, Schedule II, item 6.
[Inserted into the trial court's reasons].

 SCHEDULE II
 RECURRING EXPENSES ON ANNUAL BASIS
 ITEM PRESENT ANNUAL COSTS$
 ....
6. Durable & Disposable Equipment/ Annual Frequency
 Reclining Wheelchair with Adaptions/
 0.2 - 761.80;
 Maintenance/ 1 - 200.00;
 Charger/ 0.5 - 102.36;
 Prone Stander/ 0.33 - 333.33;
 Batteries/ 2 - 100.00;
 Wheelchair Cushion/ 2 - 850.00;
 Shower Wheel Chair/ 0.2 - 550.00;
 Hoyer Lift/ 0.143- 176.00;
 Transfer Board/ 0.246- 8.84;
 Betabed Pressure Equipment/ 0.5 - 140.00;
 Phone Aids/ 0.2 - 29.95;
 Feeding Aids/ 0.5 - 139.18;
 Personal Hygiene - 2.40;
 Catheter Supplies - 1,514.24;
 Pulmo-Aide/ 0.33 - 50.00[;]
 Pulmonary Supplies - 2,993.00 8,031.50

The Court did not allow any awards for recreation equipment on a recurring basis because there was no proof of the need or even of a proclivity of the plaintiff for such.
All of those costs which will be recurring every year for the remainder of Tyrone's life must be determined. The amount of the respective annual costs awarded by the Court were adjusted for the respective inflation rates used by Doctor Pat Culbertson (see Exhibit P-21) and both the future total amounts as well as the present value of such total amounts, were calculated using Doctor Culbertson's values. For details see appendix C, Schedule III.
[Inserted into the trial court's reasons].

 SCHEDULE III
 PRESENT VALUE OF RECURRING ANNUAL EXPENSES$
 ANNUAL INFLATION(1) TOTAL(2) PRESENT(2)
 ITEM COST FACTOR AMOUNT VALUES
1. Medical Evaluations/
 Treatment 1,286.50 7.8% 743,597.00 90,055.00
2. Therapeutic
 Evaluations 180.00 7.8% 104,040.00 12,600.00
3. Therapy & Support
 Care 59,589.60 7.3% 28,841,366.00 3,694,555.00
4. Maintenance 0.00 - - 0.00
5. Transportation 2,212.70 6.5% 809,898.00 112,847.70
6. Durable & Disposable
 Equipment 8,031.50 6.5% 2,939,514.65 409,606.50
 __________
 TOTALS: $4,319,664.20

*87 (1) Based on Dr. Patton Culberton's [sic] report, Exhibit P-21.
(2) Calculated by using the results in Dr. Patton Culbertson's report, fractored [sic] proportionately to the annual cost found by the Court to be appropriate awards.
The total present value of these are $4,319,664.20.
In reviewing a damage award, we must determine if the trial court abused its "much discretion" in its award. La.Civ.Code art. 2324.1; Youn, 623 So.2d 1257. After a thorough and careful review of the evidence and testimony, we find no abuse of discretion in the trial court's award even though it is much less than the proof that the plaintiff offered at trial.
The trial court's award is well within the range of future medical awards for quadriplegia. See generally, Poche v. State, Through Dept. of Transp. & Dev., 93-0369 (La.App. 1 Cir. 3/11/94); 633 So.2d 913, writ denied, 94-0851 (La.5/13/94); 637 So.2d 1071 ($1,750,000.00); Thibodeau, 619 So.2d 595 ($2,618,564.00); Jenkins v. State, Dept. of Transp. and Dev., 619 So.2d 1188 (La.App. 1 Cir.), writ granted, 625 So.2d 1050, writ denied in part, 625 So.2d 1058 (La.1993) ($5,000,000.00); Socorro v. Orleans Levee Bd., 561 So.2d 739 (La.App. 4 Cir.), writ granted, 568 So.2d 1068 (La.1990), 579 So.2d 931 (La.1991) ($4,352,943.00).
This assignment of error is without merit.

LOSS OF FUTURE EARNING CAPACITY
The trial court awarded loss of future income in the amount of $289,775.00. This award was based on an economic level of minimum wage for Bowens' work life expectancy, which was thirty-seven and one-quarter years. Bowens asserts that this was error; that, but for the accident, he would have attended and successfully completed college and would have been employed as a computer science graduate; thus, the judgment should be increased for past and future lost wages to $1,105,320.00.
The question we have to decide is whether the trial court abused its "much discretion" in the award of loss of future income. Trahan v. Savage Indus., Inc., 96-1239 (La.App. 3 Cir. 3/5/97); 692 So.2d 490, writs denied, 97-1636 (La.10/3/97); 701 So.2d. 207; 97-1652 (La.10/3/97); 701 So.2d. 209.
In Myers v. Broussard, 96-1634, p. 18-19 (La.App. 3 Cir. 5/21/97); 696 So.2d 88, 98, this court discussed the requirements for proof of loss of future earning capacity. We said:
Before [a plaintiff] can recover for [his] loss of future earning capacity, [he] must prove the loss, not with mathematical certainty, but with reasonable certainty. Gauthier v. Kansas City S.R. Co., 96-529 (La.App. 3 Cir. 11/6/96); 682 So.2d 993, writ denied, 96-2918 (La.1/24/97); 686 So.2d 867. Future loss of earnings is inherently speculative and must be proven with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed. Perritt v. Commercial Union Ins. Co., 95-1274 (La. App. 3 Cir. 3/13/96); 673 So.2d 215, writ denied, 96-1751 (La.10/11/96); 680 So.2d 644. An award for loss of future earning capacity is not based merely upon the difference between the injured person's preaccident wages and post-accident wages but rather it should be based on the difference between the injured person's earning capacity before and after the accident. Hollie v. Beauregard Parish Police Jury, 96-198 (La.App. 3 Cir. 8/28/96); 680 So.2d 1218.
(Emphasis added.)
The trial court found that before the injury, as a high school senior, his earning capacity was minimum wage. In so finding, the court failed to take into account the unrefuted testimony of Bowens, his parents, his high school football coach, and the high school secretary for whom he worked at school who testified that, but for the accident, he would have more probably than not *88 gone to college and graduated in computer science. The record reveals that his plans had been long range, that he had the ability and grades, and that not only was going to college his intent, but that he and others, acting on his behalf, had actually taken steps to make it happen. For example, his coach testified that, on Bowens' behalf, he had made calls and a visit to one of the universities from whom Bowens was trying to get an athletic scholarship and that the university was one of the two which had been actively recruiting him. There was further testimony that if he had not been awarded a scholarship, he was considering service in the armed forces in order to secure the benefits to finance his college education. After the accident, his physical infirmities are such that he is not able to manuever from one location to another without assistance.
The trial court abused its vast discretion in ignoring this evidence. The evidence at the time of this accident was sufficient to prove with reasonable certainty that, but for this accident, Bowens would have attended college.
We note with interest another high school student who demonstrated much future promise in high school, as Bowens did. She recovered for the loss of future earning capacity ($706,200.00) because of the assumption that she would have successfully completed college and become employed in her chosen field. See generally, Lee v. USAA Cas. Ins. Co., 540 So.2d 1083 (La.App. 1 Cir.), writs denied, 542 So.2d 514-15 (La.1989).
Morgan v. Willis-Knighton Med. Ctr., 456 So.2d 650, 658-59 (La.App. 2 Cir.1984), provides excellent guidelines for analyzing this issue:
A number of factors must be analyzed in determining loss of future income, including the plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount plaintiff probably would have earned absent the injury complained of; and the probability he would have continued to earn wages over the balance of his working life. It is well established that a loss of future income award is not merely predicated upon the difference between a plaintiff's earnings before and after a disability injury. Such an award is predicated, more strictly considered, upon the difference between a plaintiff's earning capacity before and after a disabling injury. Loss of future income awards thus encompass the loss of plaintiff's earning potentialthe loss or reduction of a persons' [sic] capability to do that for which he is equipped by nature, training, and experience, and for which he may receive recompense.
(Citations omitted; emphasis original.)
Because of the trial court's error, we hereby increase the award for past and future wage losses to those calculated by Bowens' expert economist, Dr. W.P. Culbertson, $1,105,320.00. The judgment will be amended accordingly.
This assignment of error is granted.

LA.R.S. 13:5112(C)
In the judgment, DOTD is ordered to pay plaintiffs' legal interest on all amounts, and:
[I]t is ordered to pay herein at the rate provided by La.C.C. Art. 2924 from date of judicial demand until November 22, 1995, at the rate of six (6%) percent per annum as provided by LSA-R.S. 13:5112 C from November 23, 1995 until signing of Judgment by the Trial Court, and thereafter at the rate provided by La.C.C. Art. 2924 until paid[.]
This accident occurred on February 17, 1990. La.R.S. 13:5112(C) did not become effective until November 23, 1995. Bowens contends that the trial court's application of the legal interest limitation found in La.R.S. 13:5112(C) was error, as it is a substantive law and therefore could not be applied retroactively to these damage awards.
La.R.S. 13:5112(C) states:
Legal interest on any claim for personal injury or wrongful death shall accrue at six percent per annum from the date service is requested following judicial demand until the judgment thereon is signed by the trial judge in accordance with Code of Civil Procedure Article 1911. Legal interest accruing subsequent to the signing of the judgment shall be at the rate fixed by Civil Code Article 2924.
*89 The legal issue is whether this statute should have been retroactively applied to the legal interest awards against DOTD in this case.
La.Civ.Code art. 6. states:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
La.R.S. 13:5112 does not contain a legislative expression that it is to be retroactively applied. As it limits the amount of interest that may accrue in a personal injury case, it is a substantive law. See Martino, 619 So.2d 87. It may not be retroactively applied to suits or "any claim for personal injury" filed before its effective date of November 23, 1995. As this suit was filed long before the effective date of the statute, the trial court erred in applying La.R.S. 13:5112(C) to the legal interest calculations on the awards against DOTD from November 23, 1995 to December 27, 1996, the date the judgment was signed.
Accordingly, we modify the judgment against DOTD to allow for legal interest for plaintiffs at the rate found in La.Civ.Code art. 2924.
This assignment of error is granted.

INTEREST ON THE COLONIAL INSURANCE POLICY
On May 22, 1991, Colonial tendered to plaintiffs and a seizing creditor of Clyde Bowens its $10,000.00 per person liability limit plus legal interest and plaintiffs' court costs in the amount of $538.57. Colonial filed a Motion for Summary Judgment, seeking dismissal as a party from the suit and relief from the payment of interest on any award or judgment in excess of its $10,000.00 policy limit. The trial court awarded plaintiffs legal interest on the value of the Colonial policy of insurance in this case, which was $10,000.00. Bowens urges that this was error because Colonial's insurance policy specifically provides that, in addition to its limit of liability, it will pay "interest on damages awarded."
Pursuant to La.R.S. 13:4203, all liability insurers are liable for interest on their policy limits from the date of judicial demand. However, all insurers are not liable for interest on excess judgments from the date of judgment. "Because section 13:4203 does not prohibit liability insurers from drafting supplemental payment provisions which limit, exclude or extend their interest obligations on excess judgments, each provision must be interpreted to determine the individual liability insurer's interest obligation on excess judgments." Martin v. Champion Ins. Co., 95-0030, p. 8 (La.6/30/95); 656 So.2d 991, 996.
The relevant provision of the Colonial insurance policy in question states:
ADDITIONAL PAYMENTS
As respects an insured person, we will pay, in addition to our limit of liability:

(1) All costs we incur in the settlement of any claim or defense of any suit;
(2) Interest on damages awarded in any suit we have paid, offered to pay, or deposited in court, that portion of the judgment which is not more than our limit of liability.
....
(Emphasis added.)
La.Civ.Code art.2046 and 2047 provide guidance in construing contracts. The former states: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."
La.Civ.Code arts.2047 states: "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter."
Accordingly, we interpret Colonial's (2) above to mean that Colonial agreed to obligate itself to pay interest on all damages awarded, not just those up to its policy limits, particularly because of its previous language that it would pay this interest "in addition to our limit of liability," and that it would do so in any suit in which it has paid that portion of the judgment, ($10,000.00) which is not more than its limit of liability. We interpret the words "which is not more *90 than our limit of liability" to modify the word "judgment" not the word "damages" in the beginning of the clause. The insurance company could have inserted the clause "which is not more than the limit of our liability" after the word "damages" if it intended that result, but it chose not to do so. The reason for such a clause is to protect the insured from interest charges during the defense of the claim. See dissent in Martin, 656 So.2d at 1000. To limit the insurance company's obligation only to interest on the value of the liability portion of the insurance policy would do violence to the purposes for such clauses.
In accordance with La.Civ.Code art.2046, no further interpretation of the provision may be made. Colonial did tender unconditionally its policy limits to plaintiffs in May 1991. Thus, the predicate for enforcement of the interest provision was met. See generally, Martin, 656 So.2d 991.
The other alternative is to declare the clause ambiguous; however, since ambiguities must be construed in favor of the insured in this case [see generally, Ealy v. Hertz Corp., 630 So.2d 857 (La.App. 3 Cir.1993), writ denied, 94-0074 (La.3/25/94); 635 So.2d 236], such an analysis would lead us to the same result; namely, that Colonial is obligated in solido with the defendants for judicial interest on the total award made to plaintiffs from the date of judicial demand until paid, subject to a credit for legal interest that it paid to plaintiffs in its tender of policy limits to plaintiffs. The judgment is modified accordingly.
This assignment of error is granted.

CONCLUSION
The trial court's judgment is affirmed. The judgment is modified, awarding the plaintiffs legal interest against DOTD at the rate provided for pursuant to La.Civ.Code art. 2924, holding Colonial liable in solido with the other defendants for the legal interest from the date of judicial demand until paid and increasing Bowens' award for past and future earning capacity to $1,105,320.00. The total costs are $19,948.72. The defendants are equally cast for all costs. The state's portion of the costs is assessed at $6,649.57.
AFFIRMED; AFFIRMED AS AMENDED.
AMY, J., concurs in part and dissents in part and assigns reasons.
SULLIVAN, J., concurs in part and dissents in part for the reasons assigned by AMY, J.
AMY, Judge, concurring in part, dissenting in part.
I respectfully dissent from the majority opinion as it relates to the award for loss of future earning capacity. Although the trial court's award for loss of future earning capacity was based upon minimum wage for Bowens' work life, the majority increases the quantum of that award reflecting attainment of a college degree in computer science. This court has previously found that "[w]here there is a legal right to recovery but the damages cannot be exactly estimated, the courts have reasonable discretion to assess same based upon all the facts and circumstances of the case." Pierce v. Milford, 96-92, p. 8 (La.App. 3 Cir. 9/25/96); 688 So.2d 1093, 1098 (quoting Jordan v. Travelers, Ins. Co., 257 La. 995, 245 So.2d 151 (1971)). After review of the record, I find no facts and circumstances in this matter which would require the trial court to have made an award based on the likelihood of the plaintiff completing college. Rather, I find no clear error in the lower court's conclusion that the plaintiff failed to prove entitlement to compensation in this area. See Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97); 696 So.2d 88. In my opinion, any award based on a computer science degree would be purely conjectural due to the speculative nature of the evidence presented by the plaintiff. Thus, I find no manifest error in the trial court's decision.
I further dissent from that portion of the majority opinion addressing the amount of interest due pursuant to the Colonial policy. In my opinion, the language of the Colonial policy allows for interest on only that part of the judgment which does not exceed the policy limits which have been tendered, offered, or deposited with the *91 court. In the instant matter, Colonial unconditionally tendered the policy limits prior to judgment, as well as interest on that portion. For this reason, they cannot be liable for interest on the excess judgment.
As for the remainder of the majority opinion, I concur in the result.

ON REHEARING
AMY, Judge.
Upon application of Colonial Insurance Company, we granted rehearing solely to revisit the majority decision as it relates to Colonial's liability for interest due on damages in excess of that amount tendered pursuant to the Colonial policy.[1] For the reasons originally assigned in the concurrence in part, dissent in part, we now vacate that portion of the majority opinion holding Colonial liable for interest on the entirety of all amounts awarded for damages. We find meritless the remaining issue raised by Colonial on rehearing, i.e., concerning apportionment of court costs. Therefore, having vacated that portion of this court's original majority decision indicated above, we now affirm the Judgment of the district court insofar as the trial court denied the plaintiffs' request for additional interest above that previously tendered.
AMENDMENT OF JUDGMENT HOLDING COLONIAL INSURANCE COMPANY LIABLE FOR INTEREST ON THE ENTIRETY OF DAMAGES VACATED. JUDGMENT DENYING PLAINTIFFS' REQUEST FOR ADDITIONAL INTEREST AFFIRMED.
YELVERTON, J., dissents from the judgment on rehearing, believing that the interpretation of the policy language in the original opinion was correct.
COOKS, J., concurs and assigns written reasons.
WOODARD, J., dissents.
COOKS, Judge, concurring on rehearing.
On second thought, I am no longer convinced that the disputed language in the policy at issue expresses literally or otherwise an intent by Colonial to obligate itself to pay interest on all damages awarded beyond its $10,000 policy limit. The Louisiana Supreme Court in Louisiana Ins. Guar. v. Interstate Fire, 630 So.2d 759 (La.1994) cautioned: "An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." It is the "common intent" of the parties as gleaned from the words in a policy, that determines the extent of coverage. Thus, "words," though they must be accorded their general, ordinary, plain and popular meanings manifest nothing more than the parties "intent" when the contract was executed. To interpret Colonial policy as suggested by the majority on original hearing would lead to an absurd consequence and interject in this contractual dispute an "intent" not contemplated by either party. La.Civ.Code art.2046. Even if the policy is judged ambiguous from its wording, still we are required to resolve such "by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." Breland v. Schilling, 550 So.2d 609, 610-11 (La.1989). I am certain Colonial neither intended nor envisioned that the policy would obligate it to pay interest on the total damages awarded in a given case beyond its policy limits and it certainly never, ever imagined that it might have to pay interest on a judgment equaling nearly 9 million dollars when the liability exposure was limited to $10,000! And I am just as certain that the insureds never, ever expected at the time the contract was entered that the insurer was obligated to pay such interest.
For the foregoing reasons, I now join Judges Amy and Sullivan in granting rehearing *92 on this issue and reversing our original holding.
NOTES
[1] We also note that the remaining issue addressed by the original dissent, the award for loss of future earning capacity, is not before us as the remaining defendant, the State of Louisiana through the Department of Transportation and Development, has not applied for rehearing. Thus, that portion of the dissent addressing the award for loss of future earning capacity is not within the scope of this rehearing.